PEOPLE v BOBBY MARTIN
PEOPLE v THOMPSON
PEOPLE v BROWN
PEOPLE v BILLY MARTIN
PEOPLE v FRASURE

Docket Nos. 256461, 256463, 256464, 261025, 261088. Submitted May 9, 2006, at Detroit. Decided June 13, 2006, at 9:00 a.m.

Bobby Dean Martin, Roger D. Thompson, and Roger W. Brown were convicted in the Wayne Circuit Court of keeping a house of prostitution after a joint jury trial for their participation in the operation of Legg's Lounge, an adult entertainment establishment. The court, Bruce U. Morrow, J., instructed the jury that it could convict the defendants of keeping a house of prostitution as a necessarily included lesser offense of racketeering. In a separate jury trial before the same judge, Billy Ray Martin and James B. Frasure were convicted of racketeering for their involvement in operating the same establishment. All five defendants appealed.

The Court of Appeals *held*:

1. In the cases involving Bobby Martin, Thompson, and Brown, the trial court erred when it instructed the jury that it could convict the defendants of keeping a house of prostitution as a necessarily included lesser offense of racketeering. Although keeping a house of prostitution meets the test for a necessarily included lesser offense set forth in *People v Cornell*, 466 Mich 335 (2002), the controlling inquiry for instructions on lesser included offenses is whether the Legislature intended a particular offense to be treated as a lesser included offense of the offense charged. The Legislature has clearly indicated that racketeering is to be considered a separate and distinct offense that may be punished separately from and cumulatively with the underlying predicate offenses.

2. In the case against Billy Martin, the trial court properly found that the search warrants were valid. The affidavit on which they were based contained statements by a former employee who had witnessed illegal activities at the establishment, including drug use and prostitution. The witness stated that there was an extensive video surveillance system used to record these illegal

activities, and that the tapes were generally kept at the establishment or at one of defendant Billy Martin's homes. This information was sufficient to provide probable cause to issue the search warrants. The search warrants themselves offered sufficiently particularized guidance with respect to the items to be seized, naming tape recording or surveillance equipment and computer software that would reveal the alleged drug trafficking and prostitution. The scope of the search properly included equipment and documentation used in the day-to-day operations of the business, such as videotapes, business records, tax forms, and the safety deposit boxes where such items might be found. The police were entitled to seize any guns found on the premises for their own safety and to ensure that the guns were lawfully possessed. The officers' failure to leave a copy of the affidavit with the property owner or at the search location was irrelevant because at the time the search warrants were executed, leaving a copy was no longer a statutory requirement.

3. The trial court did not err in denying defendant Billy Martin's request for an evidentiary hearing based on the defendant's contention that the affidavit supporting the search warrants was misleading regarding the cause of death of a Legg's Lounge patron. Discussion of the death was included only to explain why the investigation was initiated and to establish the witness's firsthand knowledge of the establishment's operation. Furthermore, notwithstanding references to the patron's death as "suspicious," nothing in the affidavit contradicted the fact that he died of natural causes, not as the result of illegal activity. Finally, even if the contested statements were omitted, the remaining statements would have sufficed to support a probable cause finding.

4. The trial court properly denied defendant Billy Martin's motion for a directed verdict. The defendant's contention that the videotapes were inadmissible hearsay is too inadequately briefed to merit consideration; the statements Bobby Martin made to his ex-wife regarding the profits he made from Legg's Lounge are not hearsay because they were made during the course and in furtherance of the conspiracy; and Bobby Martin's statements regarding his knowledge of the illegal activities performed there were subject to the hearsay exception for statements against one's penal interest. The prosecution presented sufficient evidence for a jury to conclude that the defendant was employed by or associated with an enterprise and that the defendant knowingly conducted or participated in the enterprise's affairs by committing at least two racketeering offenses that were interrelated, amounted to or posed a threat of continued criminal activity, and were committed for

financial gain. These offenses were keeping a house of prostitution and accepting the earnings of a prostitute. Contrary to the defendant's contention, the prosecution was not required to prove that the enterprise itself intended to commit the predicate acts, or that the various defendants conspired to violate the statute in the same manner. The defendant's citations of federal authorities interpreting the federal racketeering statute are not persuasive because the relevant provision of Michigan's racketeering statute is not ambiguous, making reliance on federal authorities inappropriate.

5. In the case against Billy Martin, the trial court erred in instructing the jury that it could consider the predicate offenses as lesser included offenses of racketeering; however, because the jury did not convict the defendant of the predicate offenses, this error was harmless.

6. The trial court's imposition on defendant Billy Martin of the costs associated with the investigation and prosecution based on findings not made by the jury did not violate the defendant's Sixth Amendment right to a trial by jury. Assessing costs does not require findings related to the elements of the underlying crime, and it is an indeterminate penalty not subject to the holding in *Blakely v Washington*, 542 US 296 (2004).

7. The trial court's two amendments of defendant Billy Martin's sentence were authorized by the court rules. The first amendment was made before a final judgment or order had been entered, and the second amendment to include the costs incurred as a result of the defendant's motion for a new trial was authorized by law. The defendant did not show that the trial court's failure to conduct a full evidentiary hearing prejudiced him. The trial court held a hearing to determine the amount of costs, and the defendant does not assert that he was denied the opportunity to present his position at the hearing or that the resulting figures were inaccurate.

8. Contrary to defendant Billy Martin's assertion, the trial court did not sever the trial; it merely exercised its discretion to determine the order in which witnesses were called. The trial court reverted to the standard manner of questioning before the defendant had finished presenting his case-in-chief, and the defendant did not demonstrate prejudicial plain error occasioned by the trial court's method of reordering the witnesses.

9. In the case against Billy Martin, the trial court was not required to give a specific jury instruction regarding the unanimity

requirement because no evidence of alternative acts was presented and the defendant did not contest the nature of the acts he was alleged to have committed.

10. Sufficient evidence was presented to establish that defendant Frasure violated the racketeering statute and accepted the earnings of a prostitute. Testimony indicated that the defendant worked as a DJ at Legg's Lounge, that the defendant watched the video surveillance monitors of the downstairs VIP lounge while sex acts were occurring, and that the prostitutes would tip the defendant ten percent of their earnings and more if he arranged to set them up with clients. The fact that the defendant offered the prostitutes his DJ services as they plied their trade does not constitute consideration for accepting their earnings, because the term "consideration" does not include the provision of goods and services that are intended to further the business of prostitution. The prosecution was not required to prove that the defendant held a position of authority within the enterprise to establish a violation of the racketeering statute.

11. In the case against Frasure, the trial court did not commit error requiring reversal in instructing the jury to consider the racketeering charge before considering the lesser included offenses. Because the predicate offenses of the racketeering charge were not necessarily included lesser offenses, the defendant was not entitled to have the jury consider them as such.

12. In the case against Frasure, the trial court's refusal to instruct the jury that a corporate agent is not responsible for the conduct of others within the corporation was not error, because the evidence did not support the instruction. The defendant was charged with offenses based only on his own conduct, and there was no reason to believe that the jury would convict him merely because he was associated with Legg's Lounge.

13. In *Frasure*, it was not necessary for the trial court to instruct the jury on the distinct elements of each method of violating the statute because there are no distinct elements for keeping a house of ill-fame, a bawdy house, or any house or place resorted to for purposes of prostitution or lewdness. Rather, the statute the defendant was charged with violating contains a single offense with the following elements: that the place in question was a house of ill-fame or a bawdy house or any house or place resorted to for purposes of prostitution or lewdness; that the defendant kept, maintained, or operated, or aided and abetted the keeping, maintaining, or operating of the house or place; and that it was resorted to for the purpose of prostitution or lewdness. Although the trial court's instruction

erroneously suggested that the jury could determine that Legg's Lounge was a house of ill-fame without proof of its reputation, this unpreserved error was harmless because there was overwhelming evidence that prostitution regularly occurred there, and the primary issue was whether the defendant had knowledge of and profited from that prostitution. The trial court did not err in failing to define several specific terms in the statute because they were generally familiar to laypersons and were susceptible of ordinary comprehension.

14. The trial court did not instruct the jury that it could find defendant Frasure guilty of racketeering for committing only one of the predicate offenses. The trial court's use of the term "and/or" referred to the fact that the predicate offenses could be proved by some or all of the means listed, depending on the nature of the charge; it did not indicate that the "pattern of racketeering" element could be met by proving only one predicate offense. Read as a whole, the instructions did not indicate that the jury could find the defendant guilty of racketeering without committing the predicate offenses for financial gain or establishing a common scheme. The trial court properly omitted instructions on conspiracy to commit or aiding and abetting the commission of racketeering because the defendant was not charged with those crimes.

Convictions of Billy Martin, Thompson, and Brown reversed and their sentences vacated.

Convictions and sentences of Billy Martin and Frasure affirmed.

1. CRIMINAL LAW — KEEPING A HOUSE OF PROSTITUTION — RACKETEERING.

Keeping a house of prostitution is not a necessarily included lesser offense of racketeering. (MCL 750.452, 750.159i, 768.32).

2. CRIMINAL LAW — JURY INSTRUCTIONS — LESSER INCLUDED OFFENSES — LEGISLATIVE INTENT.

The controlling inquiry for instructions on lesser included offenses is whether the Legislature intended a particular offense to be treated as a lesser included offense of the offense charged. (MCL 768.32).

3. CONSTITUTIONAL LAW — TRIAL BY JURY — SENTENCING — IMPOSITION OF COSTS.

The statutory provision allowing the trial court to order a defendant to pay the costs of investigation and prosecution based on findings not made by the jury is not unconstitutional (MCL 750.159j).

4. STATUTES — CONSTRUCTION — KEEPING A HOUSE OF PROSTITUTION — ELE-
    MENTS.

> Keeping a house of prostitution is a single offense that requires proof
> of the following elements: that the place in question was a house of
> ill-fame or a bawdy house or any house or place resorted to for
> purposes of prostitution or lewdness; that the defendant kept,
> maintained, or operated, or aided and abetted the keeping, main-
> taining, or operating of the house or place; and that it was resorted
> to for the purpose of prostitution or lewdness (MCL 750.452).

*Michael A. Cox*, Attorney General, *Thomas L. Casey*,
Solicitor General, *Eric B. Restuccia* and *William E.
Molner*, Assistant Attorneys General, for the people.

*Timothy P. Murphy* for Bobby Dean Martin, Roger D.
Thompson, and Roger W. Brown.

*Patrick J. McQueeney* for Billy Ray Martin.

*Michael L. Donaldson* for James B. Frasure.

Before: SMOLENSKI, P.J., and OWENS and DONOFRIO, JJ.

SMOLENSKI, P.J. In these consolidated appeals, defen-
dants appeal as of right their convictions and sentences
arising out of their participation in the operation of an
adult entertainment establishment by the name of
Legg's Lounge.[1] After a joint jury trial, defendants
Bobby Dean Martin (Bobby Martin), Roger D. Thomp-
son (Thompson) and Roger W. Brown (Brown) were
convicted of keeping, maintaining, or operating a house
of ill-fame, bawdy house, or any house or place resorted
to for the purpose of prostitution or lewdness (keeping

---

[1] The defendants were charged along with four other individuals:
Johnny Lee Hamilton, Chester H. Hill, Charles E. Drayer, and John
Allen-Lee Tomason. Hill, Tomason, and Drayer pleaded guilty of lesser
offenses before trial. Hamilton was tried along with Billy Ray Martin and
Frasure, but the trial court directed a verdict in his favor after the close
of proofs.

a house of prostitution) in violation of MCL 750.452. The trial court sentenced Bobby Martin, Thompson, and Brown each to two years' probation.

In a separate jury trial, defendants Billy Ray Martin (Billy Martin) and James B. Frasure (Frasure) were convicted of knowingly conducting or participating in the affairs of an enterprise directly or indirectly through a pattern of racketeering activity (racketeering) in violation of MCL 750.159i(1). The trial court sentenced defendant Billy Martin to three years' probation and ordered him to perform 200 hours of community service. The trial court also sentenced defendant Frasure to three years' probation, but ordered him to perform 300 hours of community service.

We affirm the convictions of Billy Martin and Frasure. However, because we conclude that the trial court erroneously instructed the jury that it could convict defendants Bobby Martin, Thompson, and Brown of keeping a house of prostitution as a necessarily included lesser offense of racketeering, we reverse and vacate their convictions for that offense.

### I. LESSER INCLUDED OFFENSE OF RACKETEERING

In Docket Nos. 256461, 256463, and 256464, defendants Bobby Martin, Brown, and Thompson argue that the trial court committed error warranting reversal when it instructed the jury that it could convict them of keeping a house of prostitution as a necessarily included lesser offense of racketeering. We agree.

Whether keeping a house of prostitution is a necessarily included lesser offense of racketeering is a question of law, which this Court reviews de novo. *People v Nickens*, 470 Mich 622, 625-626; 685 NW2d 657 (2004). This Court also reviews de novo the proper interpreta-

tion of a statute. *Macomb Co Prosecutor v Murphy*, 464 Mich 149, 157; 627 NW2d 247 (2001).

Although the prosecution alleged that defendants kept a house of prostitution in violation of MCL 750.452 as one of the predicate offenses necessary to prove that defendants violated Michigan's racketeering statute, see MCL 750.159f(c) and MCL 750.159g(ee), defendants were not separately charged with that offense. In April 2004, the prosecution moved the trial court to permit amendment of the information to include one count of keeping a house of prostitution and one count of knowingly accepting, receiving, levying, or appropriating any money or valuable thing without consideration from the proceeds of the earnings of any woman engaged in prostitution in violation of MCL 750.457 (accepting the earnings of a prostitute). However, the trial court declined to hear the motion because it was made after the deadline set for such motions. Nevertheless, at the close of proofs, but before closing arguments, the prosecution asked the court to instruct the jury that it could convict defendants of these offenses as necessarily included lesser offenses of racketeering. The trial court agreed that the offenses were necessarily included lesser offenses of racketeering and, over objection, gave the requested instructions. After deliberations, the jury returned a verdict of not guilty for each defendant on the racketeering charge. In addition, the jury found each defendant not guilty of accepting the earnings of a prostitute, but guilty of keeping a house of prostitution.

"It is ancient doctrine of both the common law and of our Constitution that a defendant cannot be held to answer a charge not contained in the indictment brought against him." *Schmuck v United States*, 489 US 705, 717; 109 S Ct 1443; 103 L Ed 2d 734 (1989). This rule is based in part on the defendant's right to have

notice of the charges against him or her. *Id.* at 718. However, a defendant is on notice when charged that he or she may be found guilty of a necessarily included lesser offense of the offense charged. *People v Cornell*, 466 Mich 335, 359; 646 NW2d 127 (2002); *Schmuck*, *supra* at 718. Hence, it is not error to instruct the jury on such necessarily included lesser offenses. *Cornell*, *supra* at 357; MCL 768.32(1).

In *Cornell, supra,* our Supreme Court addressed the propriety of instructing a jury on offenses with which the defendant was not charged. In examining the issue, the Court determined that MCL 768.32(1) governed the result. *Cornell, supra* at 341. MCL 768.32(1) provides:

> Except as provided in subsection (2),[2] upon an indictment for an offense, consisting of different degrees, as prescribed in this chapter, the jury, or the judge in a trial without a jury, may find the accused not guilty of the offense in the degree charged in the indictment and may find the accused person guilty of a degree of that offense inferior to that charged in the indictment, or of an attempt to commit that offense.

In analyzing the statutory language and the relevant precedents, the Court noted that the statute's application was not limited only to those offenses that were expressly divided into "degrees," but rather that it "was intended to extend to all cases in which different grades of offenses or degrees of enormity had been recognized." *Cornell, supra* at 353-354. Further, the Court determined that the statutory reference to "inferior" degrees foreclosed consideration of cognate offenses, "which are only 'related' or of the same 'class or category' as the greater offense and may contain some elements not found in the greater offense." *Id.* at 355.

---

[2] This section deals with lesser included offense instructions for controlled substance violations that are not relevant to this case.

Instead, only necessarily included offenses may be considered. *Id.* at 356 n 9. An offense is a necessarily included lesser offense when: (1) it is impossible to commit the greater offense without first committing the lesser offense and (2) conviction of the greater offense requires the jury to find a disputed factual element that is not part of the lesser offense. *Id.* at 361. Finally, the Court held that an "instruction on a necessarily included lesser offense is proper if the charged greater offense requires the jury to find a disputed factual element that is not part of the lesser included offense and a rational view of the evidence would support it." *Id.* at 357.

In order to prove a racketeering violation, the prosecution must prove beyond a reasonable doubt that the defendant was employed by, or associated with, an enterprise and knowingly conducted or participated in the affairs of the enterprise directly or indirectly through a pattern of racketeering activity. MCL 750.159i(1). Pursuant to MCL 750.159f(c), a pattern of racketeering activity means the commission of not less than two incidents of racketeering, to which all of the following characteristics apply:

(i) The incidents have the same or a substantially similar purpose, result, participant, victim, or method of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated acts.

(ii) The incidents amount to or pose a threat of continued criminal activity.

(iii) At least 1 of the incidents occurred within this state on or after the effective date of the amendatory act that added this section, and the last of the incidents occurred within 10 years after the commission of any prior incident, excluding any period of imprisonment served by a person engaging in the racketeering activity.

"Racketeering" is further defined as "committing, attempting to commit, conspiring to commit, or aiding or abetting, soliciting, coercing, or intimidating a person to commit" certain enumerated offenses for financial gain. MCL 750.159g. Hence, the prosecution must normally prove the commission of each element of the predicate acts of racketeering, in addition to the other elements of racketeering, in order to prove a racketeering violation.

In the present case, the prosecution charged each defendant with a single count of racketeering. The original information listed four predicate offenses as establishing the requisite pattern of racketeering activity. However, by the time of the trial, only two predicate offenses remained.[3] Thus, in order to prove the racketeering charge, plaintiff had to prove that defendants violated both predicate offenses.[4] Consequently, on the surface, the predicate offenses meet the test stated in *Cornell*, because defendants could not have committed racketeering without committing the predicate offenses and the jury could not convict defendants of racketeering without making findings regarding factual elements that were not part of the predicate offenses.

---

[3] The prosecution did not allege that defendants engaged in multiple violations of either predicate offense.

[4] In its original motion to have the jury instructed on the predicate offenses as necessarily included lesser offenses, the prosecution acknowledged that it would have to drop the cocaine delivery predicate in order for the remaining two predicates to be considered lesser included offenses. Where more than two predicate acts are listed, the jury could convict the defendant of a racketeering violation on the basis of any two predicate offenses. Hence, no single predicate offense would necessarily have to be proved in order to convict the defendant. Consequently, under this theory, a racketeering charge would only have necessarily included lesser offenses when the prosecution based the charge on only two predicate offenses.

Under a rote application of *Cornell*, predicate offenses would invariably be necessarily included lesser offenses of the predicate-based offense. However, it is not at all clear that the Legislature intended this result when it referred to "inferior" degrees in MCL 768.32(1). In his concurrence to the result in *People v Wilder*, 411 Mich 328, 360; 308 NW2d 112 (1981), Justice RYAN noted the limitations of a traditional lesser-included analysis.

> The point that needs to be made is this: that a predicate-based offense requires proof of a predicate offense does not mean that the two offenses are greater and lesser included offenses in the traditional sense. "[T]he concept of included offenses reflects a continuum of culpability." Offenses lie on the same continuum, and are therefore greater and lesser included offenses, when "the elements shared by the two offenses coincide in the harm to the societal interest to be protected". *People v Ora Jones*, 395 Mich 379, 390; 236 NW2d 461 (1975). These offenses then are tied together by logic. In contrast, predicate-based offenses and their predicates are tied together by the Legislature.

Although *Wilder* addressed whether it was a violation of double jeopardy to convict and sentence a defendant for both felony murder and the underlying predicate felony of armed robbery, *Wilder*, *supra* at 341-342, the analyses employed by the majority and concurrence are informative.

The majority began its analysis by noting that "[w]here the proof adduced at trial indicates that one offense is a necessarily or cognate lesser included offense of the other, then conviction of both offenses will be precluded." *Id.* at 343-344. The majority further recognized that the statutes under consideration were "devoid of any express or reasonably ascertainable legislative intent to create more than a single crime or punishment." *Id.* at 343. Under these circumstances,

the majority determined that the armed robbery was a necessarily included lesser offense of felony murder because the latter could not be committed without having first committed the underlying felony element of armed robbery. *Id.* at 346. Therefore, the majority concluded, the defendant could not be convicted of both offenses. *Id.* at 347.

Although Justice RYAN disagreed with the majority's analysis, he agreed that the Legislature's intent controlled the issue. *Id.* at 359. However, he would have held that the lesser included offense test was a rule of statutory construction that should only be applied when it is probative of legislative intent. *Id.* Applying the test as a rule of statutory construction, Justice RYAN concluded that the majority's "lesser included offense analysis is misplaced in the context of predicate-based offenses because it bears no logical relationship to legislative intent regarding punishment." *Id.* at 363.[5] He explained:

> In our cases that have used the lesser included offense test, the implicit assumption has been that, for committing a single criminal act, the Legislature did not intend a person to be convicted of and punished for two or more offenses lying on a single continuum of culpability. This is because each continuum comprises those offenses that serve to vindicate the same social norm. Thus, if one commits a criminal act that violates a single social norm, conviction of and punishment for a single offense would seem to vindicate the interests infringed by that act.

---

[5] In his dissent in *Whalen v United States*, 445 US 684, 708; 100 S Ct 1432; 63 L Ed 2d 715 (1980), Justice Rehnquist echoed similar concerns to those of Justice RYAN. He noted that the elements test, "although useful in identifying statutes that define greater and lesser included offenses in the traditional sense, is less satisfactory, and perhaps even misdirected, when applied to statutes defining 'compound' and 'predicate' offenses." *Id.*

> The same assumption cannot be made when the Legis-
> lature defines an offense by reference to another offense or
> class of offenses. . . .
>
> *   *   *
>
> Consequently, an inference of a legislative intent against
> multiple punishment should not arise from the fact that
> the predicate-based offense requires proof of a predicate
> offense. [*Id.* at 360-361.]

Although he noted that felony murder and the under-
lying predicate involved distinct social norms, which he
believed created a presumption in favor of multiple
punishment, Justice RYAN nevertheless concluded that
the defendant could not be punished for both offenses.

> However, this is not enough to conclude that "a clear
> legislative intent" to impose multiple punishment exists,
> and a clear legislative intent is required to overcome what
> is in effect the rebuttable presumption against multiple
> punishment contained in the Double Jeopardy Clause . . . .
>
> *   *   *
>
> For this reason, and not because proof of armed robbery
> was required to establish first-degree (felony) murder in
> this case, defendant cannot be subjected to multiple pun-
> ishment. [*Id.* at 364-365.]

Several years after the decision in *Wilder*, our Su-
preme Court noted these same limitations and, as a
result, elected to abandon the traditional elements test
stated in *Blockburger v United States*, 284 US 299; 52 S
Ct 180; 76 L Ed 306 (1932), as the only means for
ascertaining whether the Legislature intended to im-
pose multiple punishments. *People v Robideau*, 419
Mich 458, 486; 355 NW2d 592 (1984) ("Because *Block-
burger* was developed to deal with situations where an
identifiable single act falls under the coverage of two

statutes, it is even less helpful when applied to a compound crime. In these crimes, the Legislature has intentionally converted what would normally be two discrete acts into one legislatively created 'act'."); see also *People v Harding*, 443 Mich 693, 712-713; 506 NW2d 482 (1993) (noting that the traditional lesser included offense test is appropriate where it is probative of legislative intent, but recognizing that the test is not appropriate for predicate-based offenses). Instead, the Court stated that it was preferable to use traditional means to determine the intent of the Legislature. *Robideau*, *supra* at 486.

In *Cornell*, our Supreme Court held that whether an offense will be considered a lesser included offense for which the jury may properly find the defendant guilty will normally be governed by MCL 768.32(1). *Cornell*, *supra* at 341, 353. The Court further concluded that the traditional lesser included offense test described above was consistent with prior case law and applicable to MCL 768.32. *Id.* at 357. Nevertheless, the Court also recognized that, as with double jeopardy analyses, the controlling inquiry for instructions on lesser included offenses is whether the Legislature intended a particular offense to be treated as a lesser included offense of the offense charged.

> As this Court has recognized, matters of substantive law are left to the Legislature. *People v Glass (After Remand)*, 464 Mich 266, 281; 627 NW2d 261 (2001); *McDougall v Schanz*, 461 Mich 15, 27; 597 NW2d 148 (1999). Determining what charges a jury may consider does not concern merely the "judicial dispatch of litigation." *Id.*, 30. Rather, the statute [MCL 768.32] concerns a matter of substantive law." [*Cornell*, *supra* at 353.]

Hence, the test stated in *Cornell* is the primary way of ascertaining whether the Legislature intended a par-

ticular offense to be a lesser included offense of another. However, where the statutory language of a particular offense indicates a contrary intent, that specific intent will control over the general rule stated under MCL 768.32(1).[6]

In the present case, we conclude that the Legislature did not intend the predicate offenses supporting a racketeering charge to be considered lesser included offenses of that charge. Under the penalty provisions of Michigan's racketeering statute, our Legislature stated that the "[c]riminal penalties under this section are not mutually exclusive and do not preclude the application of any other criminal or civil remedy under this section or any other provision of law." MCL 750.159j(11). This language clearly indicates that the Legislature intended racketeering to be a separate and distinct offense, the violation of which may be punished separately from and cumulatively with the underlying predicate offenses.[7] Because conviction of two offenses is precluded where

---

[6] Although we agree with Justice RYAN's conclusions regarding the limited value of the traditional lesser included analysis for ascertaining legislative intent for predicate-based offenses and question whether our Supreme Court intended the test stated in *Cornell* to be applicable to predicate-based offenses, because our Supreme Court has not indicated otherwise, we would apply the *Cornell* test to predicate-based offenses in the absence of a stated legislative intent to the contrary.

[7] We note that this conclusion is consistent with federal authorities examining the analogous federal Racketeering Influenced and Corrupt Organizations Act (RICO), 18 USC 1961 *et seq.* See *United States v Hawkins*, 658 F2d 279, 287 (CA 5, 1981) (noting that Congress intended to permit cumulative sentences for substantive RICO offenses and the underlying predicate offenses); *United States v Rone*, 598 F2d 564, 571 (CA 9, 1979) ("The Government is not required to make an election between seeking a conviction under RICO, or prosecuting the predicate offenses only. Such a requirement would nullify the intent and effect of the RICO prohibitions."); *United States v Esposito*, 912 F2d 60, 66 (CA 3, 1990) (holding that a "predicate act included in a RICO indictment is not a lesser included offense of a substantive RICO charge . . . .")

the one is a necessarily included lesser offense of the other, *Wilder, supra* at 343-344, treatment of the underlying predicate offenses of racketeering as necessarily included lesser offenses of racketeering is inconsistent with the Legislature's intent to permit punishment for both racketeering and the underlying predicate offenses. Therefore, the predicate offenses of racketeering are not necessarily included lesser offenses of that offense.

The trial court erred when it instructed the jury that it could find defendants Bobby Martin, Brown, and Thompson guilty of the uncharged offense of keeping a house of prostitution as a necessarily included lesser offense of racketeering. Consequently, we reverse their convictions and vacate their sentences for keeping a house of prostitution in violation of MCL 750.452.

Because of our resolution of this issue, we need not address the other claims of error raised by defendants Bobby Martin, Brown, and Thompson.

## II. SEARCH WARRANTS

In Docket No. 261025, defendant Billy Martin first argues that the search warrants issued on May 3, 2002, were based on unreliable information, contained false representations, and failed to state with particularity the premises to be searched and the things to be seized. In addition, defendant alleges that the police seizures exceeded the scope of the warrants and that the police failed to leave a proper copy of the search warrant at the locations searched. Because of these defects, defendant concludes, the search warrants of May 3, 2002, and all subsequent warrants were invalid and should have been suppressed by the district and circuit courts. We disagree.

A. STANDARD OF REVIEW

"[A]ppellate scrutiny of a magistrate's decision involves neither de novo review nor application of an abuse of discretion standard." *People v Russo*, 439 Mich 584, 603; 487 NW2d 698 (1992). Instead, this Court need only ask "whether a reasonably cautious person could have concluded that there was a 'substantial basis' for the finding of probable cause." *Id.* Because of the strong preference for searches conducted pursuant to a search warrant, a magistrate's decision regarding probable cause should be paid great deference. *Id.* at 604, citing *Illinois v Gates*, 462 US 213, 236-237; 103 S Ct 2317; 76 L Ed 2d 527 (1983). "Affording deference to the magistrate's decision simply requires that reviewing courts ensure that there is a substantial basis for the magistrate's conclusion that there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *Russo, supra* at 604, quoting *Gates, supra* at 238. Finally, this Court reviews a trial court's factual findings in a ruling on a motion to suppress for clear error, *People v Jenkins*, 472 Mich 26, 31; 691 NW2d 759 (2005), but reviews de novo a trial court's interpretation of the law or the application of a constitutional standard to uncontested facts, *People v Attebury*, 463 Mich 662, 668; 624 NW2d 912 (2001).

B. PROBABLE CAUSE

We shall first address defendant's argument that the affidavits supporting the search warrants of May 3, 2002, contained insufficient facts to establish probable cause to issue a search warrant. We note that defendant does not contest the sufficiency of the affidavits in support of the search warrants issued after May 3, 2002, but rather concludes that, because those warrants relied on the affidavits contained in the earlier search

warrants, they too must fail if the affidavits for the May 3, 2002, search warrants are found to be insufficient. Therefore, we shall only address the sufficiency of the search warrants issued on May 3, 2002.

A search warrant may not be issued absent probable cause to justify the search. US Const, Am IV; Const 1963, art 1, § 11; MCL 780.651(1). "Probable cause to issue a search warrant exists where there is a 'substantial basis' for inferring a 'fair probability' that contraband or evidence of a crime will be found in a particular place." *People v Kazmierczak*, 461 Mich 411, 417-418; 605 NW2d 667 (2000), quoting *Russo, supra* at 604. Furthermore, the search warrant and underlying affidavit must be read in a commonsense and realistic manner to determine whether a reasonably cautious person could have concluded that there was a substantial basis for finding probable cause. *Russo, supra* at 603-604.

Probable cause must be supported by oath or affirmation. US Const, Am IV; Const 1963, art 1, § 11; *People v Stevens (After Remand)*, 460 Mich 626, 634-635; 597 NW2d 53 (1999). When reviewing the issuance of a search warrant, the reviewing court must focus on the facts and circumstances supporting the magistrate's probable cause determination. *People v Sloan*, 450 Mich 160, 168; 538 NW2d 380 (1995), overruled in part on other grounds by *People v Hawkins*, 468 Mich 488; 668 NW2d 602 (2003). If the search warrant is supported by an affidavit, the affidavit must contain facts within the knowledge of the affiant and not mere conclusions or beliefs. *Id.* at 168-169. The affiant may not draw his or her own inferences, but rather must state matters that justify the drawing of them. *Id.* at 169.

On May 3, 2002, a search warrant was issued for Legg's Lounge and a residence located behind Legg's Lounge (Warrant #1). The warrant was supported by

an affidavit made by detective Marc Abdilla. In his affidavit, Abdilla noted that police had been called to Legg's Lounge on April 21, 2002, to assist with a man who apparently suffered a heart attack. He further stated that on April 29, 2002, a witness by the name of Wendy Pomerico contacted the Van Buren Township police department and wanted to speak with an officer regarding the death of that man. Abdilla averred that on May 2, 2002, he and another officer interviewed Pomerico at her residence.

In his affidavit, Abdilla described the information obtained from Pomerico. According to Abdilla, Pomerico told them that she had worked for Hamilton and defendant for four years and that for the last 3½ years she had worked as a dancer at Legg's Lounge. Pomerico further told Abdilla that she was working on April 21, 2002, and noted that it was Thompson's birthday. Pomerico stated that she heard that a man had had a heart attack and was supposed to be lying near the DJ booth, but that nobody was in that area. She further stated that after approximately 45 minutes to an hour, the lights went on and she then observed the man's body near the DJ booth. She stated that it was her belief that the man was in the basement area where sexual favors were performed and that the management delayed calling the police so they could clean up evidence of illegal activities and move the body.

Abdilla also averred that Pomerico described illegal activities at Legg's Lounge, including drug use and prostitution in the basement. Abdilla noted that Pomerico described video surveillance equipment and stated that all the activities in the bar were videotaped. She also told Abdilla that defendant told her that he had all the tapes at his house, which could mean either his house on Merriman Road or the house directly behind the bar.

On the same day, another search warrant was issued for 3918 Merriman Road (Warrant #2). This warrant was also supported by an affidavit made by Abdilla, which recounted the same facts as found in the affidavit attached in support of Warrant #1. However, this warrant also described additional allegations supplied by Pomerico.[8] Specifically, Abdilla averred that Pomerico told him that defendant used the house behind Legg's Lounge as a "flop house" where he videotaped women for posting to the Internet. She further stated that threats had been made against her and that the management forced girls into prostitution. Abdilla also stated that Pomerico told him that defendant told her that he records the activities at the bar in order to use them against the dancers and the police officers who come into the establishment. Abdilla related that Pomerico also described a warning system that management activates when police officers approach the bar. Finally, Abdilla averred that the police department had received similar information in the past, but had not been able to act on the information because of the reluctance of witnesses to testify.

The affidavits in support of these search warrants were adequate to support a finding of probable cause. The affidavits attached to the search warrants detail the statements made by Pomerico to Abdilla. In those statements, Pomerico noted that she worked as a dancer at Legg's Lounge for more than three years and described illegal activities that occur there. She noted that drugs were used at Legg's Lounge and that prostitution occurred in the basement area, which she stated was only accessible to VIP members. She also

---

[8] We note that Warrant #1, as attached to the exhibits of the parties, appears to be incomplete. Warrant #1 is labeled as having five pages, but only four are attached.

described an extensive surveillance system used to record the illegal activities. Further, Pomerico was able to identify several members of the management, including defendant, and stated that defendant told her that he kept videotapes at his home. She was further able to clarify that defendant's reference to his home could mean his home on Merriman (the subject of Warrant #2) or the house behind Legg's Lounge (one of the properties listed in Warrant #1). Finally, Pomerico was able to describe the events of the day on which a man died of a heart attack at Legg's Lounge, stating that the man's body was not originally located at the DJ booth and that there was a substantial delay between the first accounts of the man's heart attack and the call for help from the police. From her experience, Pomerico stated that the delay was likely caused by management's need to clean up evidence of illegal activities in the bar. When read in a commonsense and realistic manner, these facts support the determination that a reasonably cautious person could have concluded that there was a substantial basis for inferring that contraband or evidence of a crime would be found at the places described. *Russo, supra* at 603-604; *Kazmierczak, supra* at 417-418.

Furthermore, the statements by Pomerico met the requirements of MCL 780.653, which states:

> The magistrate's finding of reasonable or probable cause shall be based upon all the facts related within the affidavit made before him or her. The affidavit may be based upon information supplied to the complainant by a named or unnamed person if the affidavit contains 1 of the following:
>
> (a) If the person is named, affirmative allegations from which the magistrate may conclude that the person spoke with personal knowledge of the information.
>
> (b) If the person is unnamed, affirmative allegations from which the magistrate may conclude that the person

spoke with personal knowledge of the information and either that the unnamed person is credible or that the information is reliable.

Personal knowledge can be inferred from the stated facts. *People v Stumpf*, 196 Mich App 218, 223; 492 NW2d 795 (1992).

In this case, the affidavit named Pomerico as the witness. Hence, the allegations need only be such that the magistrate could conclude that they were spoken from personal knowledge.[9] MCL 780.653; *People v Ulman*, 244 Mich App 500, 514; 625 NW2d 429 (2001) (noting that it is not necessary to vouch for the credibility of a named informant in the affidavit). Pomerico's allegations contain statements that indicate that she spoke from personal knowledge. Pomerico said that she was a longtime employee of Legg's Lounge and that she worked on the day that a man had a heart attack, which event Abdilla confirmed. She further described the events of that day, including what she heard and observed. Pomerico even stated that she walked in on a conversation and that she believed, *from experience*, that the delay in calling for help was occasioned by a need to clean up evidence of illegal activities in the basement area. These statements clearly indicate that Pomerico spoke from personal knowledge of the events of that day. Furthermore, she described key members of the management team at Legg's Lounge, including the owner, and described the two residences defendant

---

[9] Defendant's argument that the police had to determine whether the information was reliable by conducting an independent investigation is without merit. Because Pomerico was a named informant, the only requirement was that the affidavit contain affirmative allegations from which the magistrate may conclude that Pomerico spoke with personal knowledge. MCL 780.653. Furthermore, the fact that the police had received earlier tips that comported with the information given by Pomerico indicate that her allegations were reliable.

used. She noted that drugs and prostitution were prevalent in the bar and that the prostitution occurred in the basement, which was only accessible to patrons who had a VIP card. She also described an elaborate video surveillance system and stated that defendant *told* her that he kept videotapes of the activities at Legg's Lounge in case "he needs to use it against them." Finally, she described the warning system used when police approached the bar.

Many of these allegations, such as statements concerning her observations on April 21, 2002, and her statements about what she was told, are indicative of having come from personal knowledge. In addition, the specificity of the details Pomerico provided in the remaining allegations are clear indicia of personal knowledge. See *Stumpf, supra* at 223. Consequently, the affidavits were adequate to support a determination that probable cause existed to issue the search warrants.

### C. PARTICULARITY

Defendant also argues that the search warrants lacked sufficient particularity in the description of the places to be searched and the items to be seized. With regard to the search warrant for 3918 Merriman, defendant also claims that the search warrant inappropriately authorized the seizure of evidence related to the activities and day-to-day operations of the bar without clarifying which bar was referred to in the search warrant. We disagree that the search warrants lacked sufficient particularity.

A search warrant must describe with particularity the place to be searched and the persons or things to be seized. US Const, Am IV; Const 1963, art 1, § 11; MCL 780.654. With regards to the description of the place to

be searched, "[i]t is enough if the description is such that the officer with a search warrant can with reasonable effort ascertain and identify the place intended." *Steele v United States*, 267 US 498, 503; 45 S Ct 414; 69 L Ed 757 (1925). The purpose of the particularity requirement in the description of items to be seized "is to provide reasonable guidance to the executing officers and to prevent their exercise of undirected discretion in determining what is subject to seizure." *People v Fetterley*, 229 Mich App 511, 543; 583 NW2d 199 (1998); see also *Maryland v Garrison*, 480 US 79, 84; 107 S Ct 1013; 94 L Ed 2d 72 (1987). "The degree of specificity required depends on the circumstances and types of items involved." *People v Zuccarini*, 172 Mich App 11, 15; 431 NW2d 446 (1988); see also *United States v Henson*, 848 F2d 1374, 1383 (CA 6, 1988).

The search warrants issued on May 3, 2002, describe the places to be searched by reference to their common addresses and descriptions of the premises located at those addresses. These descriptions were such that the searching officers could with reasonable effort ascertain and identify the place intended to be searched. *Steele*, *supra* at 503. Hence, the search warrants met the particularity requirements for the description of the places to be searched.

With regard to the items to be seized, both search warrants stated:

> Any video or audio tape recording equipment, including VHS tapes, video surveillance, computer aided video surveillance, computer software, computer enhanced imaging or any other equipment and written documation [sic] used in the reproduction or storage of the activities and day to day operations of [the] bar. The tabulation of this evidence would show the narcotic trafficing [sic] and prostitution that goes on in the establishment.

As already noted, the affidavit supported a determination that there was probable cause to believe that drug trafficking and prostitution occurred at Legg's Lounge. Furthermore, in her statements to Abdilla, Pomerico indicated that defendant told her that he kept videotapes of the activities at the bar at his home, which she stated could mean either the residence behind Legg's Lounge or his home on Merriman. Hence, there was probable cause to believe that evidence of the crimes that occurred at Legg's Lounge would be found at the two residences as well.

Furthermore, the descriptions of the items to be seized from these three locations was sufficiently particularized. The search warrants authorized the search for equipment or written documentation used in the reproduction or storage of the activities and day-to-day operations of the bar. This sentence is further qualified by the reference to the drug trafficking and prostitution activities that were thought to take place there. See *Zuccarini, supra* at 16 (noting that a reference to the illegal activities may constitute a sufficient limitation on the discretion of the searching officers). Thus, examining the description in a commonsense and realistic manner, it is clear that the officers' discretion was limited to searching for the identified classes of items that were connected to drug trafficking and prostitution activities at Legg's Lounge. *Id.* Hence, the search warrant provided reasonable guidance to the officers performing the search. *Fetterley, supra* at 543. Therefore, the search warrants met the particularity requirement.

Defendant's contention that the search warrant issued for 3918 Merriman was insufficient because it authorizes the seizure of items related to the activities and day-to-day operations of "the bar" and refers to

"the establishment," without properly identifying either, is also without merit. It is clear on its face that the search warrant in question authorizes the search of a two story, single-family dwelling located at 3918 Merriman Road in Wayne County, Michigan. Although the order to seize refers to a "bar" and an "establishment," it is clear from a commonsense and realistic reading of the search warrant that the words "bar" and "establishment" refer to Legg's Lounge. Indeed, the supporting affidavit makes it abundantly clear that the alleged drug trafficking and prostitution occurred at Legg's Lounge, but that some evidence may be stored at defendant's home on Merriman. Read in context, it is clear that the warrant limits the seizure of evidence to those items related to the activities and day-to-day operations of Legg's Lounge. Consequently, this search warrant was not defective for a lack of particularity.

### D. SCOPE OF THE SEARCH

Defendant next argues that the officers who conducted the searches grossly exceeded the scope of the search warrants and thereby transformed them into general warrants, necessitating suppression of all the evidence seized. Specifically, defendant contends that the officers exceeded the scope of the warrants when they seized computers, personal videos, personal tax returns, guns, a safe, and safety deposit box keys. We disagree.

If an officer executing a search exceeds the scope "permitted by the terms of a validly issued warrant or the character of the relevant exception from the warrant requirement, the subsequent seizure is unconstitutional without more." *Horton v California*, 496 US 128, 140; 110 S Ct 2301; 110 L Ed 2d 112 (1990). However, where an officer is lawfully present at a

location pursuant to a validly issued search warrant, the officer may seize evidence that falls outside the bounds of the items described in the search warrant, if one of the exceptions to the warrant requirement applies to the item seized. *Id.* at 141-142. In addition, some courts have held that "even evidence which is properly seized pursuant to a warrant must be suppressed if the officers executing the warrant exhibit 'flagrant disregard' for its terms." *United States v Medlin*, 842 F2d 1194, 1198-1199 (CA 10, 1988). In *Medlin*, the court explained that such a blanket exclusion is warranted because the flagrant disregard for the terms of the search warrant undermines the particularity requirement and transforms it into a general warrant. *Id.* at 1199.

In the present case, defendant has failed to demonstrate that any of the items seized were outside the scope of the search warrants or a relevant warrant exception, let alone that the seizures were executed with such flagrant disregard for the terms of the warrant as to justify the blanket suppression of all evidence seized.

The warrants for Legg's Lounge, the residence behind Legg's Lounge, and defendant's residence at 3918 Merriman permitted the seizure of equipment and written documentation used in the reproduction or storage of the activities and day-to-day operations of the bar. Hence, the seizure of computers, videos, and business records, including tax forms, were within the scope of the search warrants. Furthermore, the police could lawfully seize guns found on the premises for their own safety and to ensure that the guns were lawfully possessed. *United States v Bishop*, 338 F3d 623, 626-627 (CA 6, 2003) (stating that the plain view exception permits the warrantless seizure of objects dangerous in

themselves), citing *Coolidge v New Hampshire*, 403 US 443, 472; 91 S Ct 2022; 29 L Ed 2d 564 (1971) (plurality opinion). Likewise, the police could lawfully search containers located on the premises to be searched, including safes. *United States v Ross*, 456 US 798, 820-821; 102 S Ct 2157; 72 L Ed 2d 572 (1982) ("A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search."); *People v Daughenbaugh*, 193 Mich App 506, 516; 484 NW2d 690 (1992) (holding that the seizure of a safe located on the premises, which was later opened at the police station, was proper). Because a safety deposit box could contain the items described by the search warrant, the police could also lawfully seize the keys. Hence, the seizure of each of the items noted by defendant was either within the scope of the search warrants or within the scope of a relevant warrant exception.

### E. COPIES OF AFFIDAVITS

Finally, defendant contends that the failure to attach the affidavits supporting the issuance of the search warrants to the copies left at the places searched violated the requirements of MCL 780.655. He further contends that, because this failure was intentional rather than incidental, this Court should suppress the search warrants. However, MCL 780.655 was amended by 2002 PA 112, which became effective April 1, 2002. After amendment, the officers executing the search warrant were no longer required to give a copy of the affidavit supporting the search warrant to the person from whose possession the property was taken or to leave a copy at the location of the search. See MCL

780.655(1). Therefore, because the search warrants in question were all issued after the effective date of 2002 PA 112, defendant's argument must fail.

### F. CONCLUSION

The search warrants were properly supported and established probable cause. Likewise, the search warrants were sufficiently particularized to guide the police officers' searches and the searches were properly executed. Therefore, there were no errors warranting suppression.

### III. *FRANKS* HEARING

Defendant Billy Martin next contends that the trial court erred when it refused to grant his request for an evidentiary hearing pursuant to *Franks v Delaware*, 438 US 154; 98 S Ct 2674; 57 L Ed 2d 667 (1978). Had the trial court permitted the hearing, defendant argues, he would have been able to establish that the affidavit in support of the search warrant of May 30, 2002, contained false statements. We disagree with defendant's conclusion that the trial court erred when it declined to hold a *Franks* hearing.

### A. STANDARD OF REVIEW

Whether to hold an evidentiary hearing based upon a challenge to the validity of a search warrant's affidavit is committed to the discretion of the trial court. *People v Poindexter*, 90 Mich App 599, 609, 609 n 4; 282 NW2d 411 (1979); *People v Howey*, 118 Mich App 431, 437; 325 NW2d 451 (1982). However, this Court reviews the facts supporting the denial of the evidentiary hearing for clear error and reviews the application of those facts to the law de novo. See *United States v Graham*, 275 F3d

490, 505 (CA 6, 2001) (stating that the proper standard of review is the same as that applicable to motions to suppress: the trial court's factual findings are reviewed for clear error and its conclusions of law are reviewed de novo); *Jenkins, supra* at 31 (applying the latter standards of review to a motion to suppress).[10]

B. ANALYSIS

On December 19, 2003, defendant Billy Martin moved the trial court for an evidentiary hearing pursuant to *Franks, supra*. Defendant claimed that a hearing was warranted because Abdilla deliberately misled the court in his affidavit in support of the searches with regard to the death that occurred at Legg's Lounge. Defendant claimed that Abdilla should have told the court that the decedent died of natural causes and should have attached a copy of the autopsy. Defendant also argued that Abdilla should have informed the court that the named witness had been convicted of embezzlement and should have told the court that, given the officer's own knowledge of the bar's layout, Pomerico could not have seen the events she claimed to have seen.

On May 21, 2004, the trial court heard arguments concerning defendant's motions. At the hearing, the trial court expressed doubt that the autopsy report undermined the statements attributed to Pomerico in the affidavit, but reserved final decision on the issue. The trial court then denied the motion to suppress in an order dated the same day. On appeal, defendant limits his argument to allegations that Abdilla deliberately misled the court when he failed to attach the autopsy

---

[10] We note that there is a split of authority in the federal courts on the proper standard of review. See *United States v Carpenter*, 422 F3d 738, 745 (CA 8, 2005) (holding that a denial of a request for a hearing pursuant to *Franks* is reviewed for an abuse of discretion).

report for the individual who died at Legg's Lounge and when he made statements that the investigation arose out of a suspicious death. Had he been granted a *Franks* hearing, defendant further contends, he could have proved that the decedent's death had nothing to do with prostitution or narcotics.

A defendant is entitled to a hearing to challenge the validity of a search warrant if he "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause . . . ." *Franks*, *supra* at 155-156; see also *Stumpf*, *supra* at 224. However, there is a presumption that the affidavit supporting the search warrant is valid. *Franks*, *supra* at 171. In order to warrant a hearing, the challenge "must be more than conclusory and must be supported by more than a mere desire to cross-examine." *Id.* The rule from *Franks* is also applicable to material omissions from affidavits. *Stumpf*, *supra* at 224.

Defendant failed to make a substantial preliminary showing that Abdilla intentionally, or with reckless disregard for the truth, made a false statement or material omission in his affidavits in support of the search warrants. In the affidavits in support of the May 3, 2002, search warrants, Abdilla states that Pomerico initially came to the police because she wanted to discuss the death of a patron on April 21, 2002, at Legg's Lounge. Abdilla also noted that Pomerico said that she was there when he died and that the decedent apparently suffered the heart attack approximately 45 minutes to an hour before the police were actually called. The affidavit also relates that Pomerico told Abdilla that she could not see the decedent by the DJ's

booth at the time she first heard of the incident, but by the time the police arrived, the decedent's body was located at the booth. Pomerico also told Abdilla that, from her experience as a dancer, she believed that the reason for the delay in calling the police was occasioned by management's need to clean up evidence of illegal activities in the downstairs area where she believed the decedent probably had been.

Although defendant makes much of the fact that the decedent's autopsy report demonstrated that he died of natural causes, there is nothing in the affidavit to suggest otherwise. Abdilla's relation of Pomerico's statements regarding the events surrounding the decedent's death is merely background information provided to explain the initiation of the investigation and to demonstrate that Pomerico spoke from firsthand knowledge of the events at the bar. Because there is no suggestion in the affidavits that the decedent died as the result of foul play or illegal activity, there was no need to attach documentation regarding the decedent's death. Hence, defendant failed to make the preliminary showing that the affidavits in support of the search warrants of May 3, 2002, contained false statements or had material omissions. See *Franks, supra* at 155-156.

Likewise, Abdilla's statement in the affidavit in support of the search warrants of May 30, 2002, does not alter this result. In his affidavit in support of the May 30, 2002, search warrant, Abdilla stated that the earlier warrants were executed as a result of a "Death Investigation" and that the "suspicious death complaint" was generated from an incident that occurred on April 21, 2002. Further, he stated that the "Death Investigation has opened the door to evidence of prostitution, narcotics, tax evasion and other fraudulent activities." Although the use of the word "suspicious" suggests that

the decedent's death was the result of foul play, taken in context and in light of the statements in the affidavits in support of the search warrants to which Abdilla refers, it is clear that these statements were neither false nor made with reckless disregard for the truth. The initial investigation did in fact arise out of complaints by Pomerico regarding the death of an individual. Hence, Abdilla could fairly describe the initial investigation as a death investigation. Furthermore, although the phrase "suspicious death" is somewhat misleading, Pomerico's statements to the police do indicate that there were suspicious circumstances surrounding the decedent's death and the eventual involvement of the police. Thus, these statements are a fair characterization of the background to the investigation into the activities at Legg's Lounge. Finally, even if the statements regarding the circumstances surrounding the decedent's death are omitted from the affidavits, Pomerico's remaining statements are still sufficient to find probable cause. Consequently, there would be no need to conduct a *Franks* hearing. *Franks*, *supra* at 155-156; *Stumpf*, *supra* at 224.

The trial court did not abuse its discretion when it denied defendant's request for a *Franks* hearing.

### IV. DIRECTED VERDICT

Defendant Billy Martin next argues that, without resorting to improper hearsay testimony, the prosecution failed to present sufficient evidence to prove the elements of the racketeering offense and the underlying predicate acts. Specifically, defendant contends that there was (1) no evidence concerning the structure of the enterprise, (2) no evidence that defendant's participation rose to the level of participation in the management or operation of the enterprise, (2) no evidence that

the enterprise intended to commit the predicate acts, (3) no evidence that the various defendants conspired to commit the same offense of the three criminalized by MCL 750.452, and (4) no showing that defendant financially gained from the commission of the predicate acts or from his association with Legg's Lounge. For these reasons, defendant argues, the trial court should have granted his motion to quash and should have granted a directed verdict in his favor. We find each of these arguments to be without merit.

### A. FAILURE TO QUASH

Although defendant argues that the trial court committed error by failing to quash the information, "where a defendant has received a fair trial, appellate review is limited to the trial court's denial of the defendant's motion for a directed verdict." *People v Gillis*, 474 Mich 105, 113; 712 NW2d 419 (2006), citing *People v Hall*, 435 Mich 599, 601-603; 460 NW2d 520 (1990). Therefore, because defendant proceeded to trial and was found guilty, we will not address whether the motion to quash was properly denied, but rather will only address defendant's argument that a directed verdict should have been granted in his favor.

### B. HEARSAY

Before addressing defendant's argument concerning the motion for a directed verdict, we shall first address defendant's contention that certain videotapes and the testimony of Angela Martin regarding statements by Bobby Martin constituted inadmissible hearsay. If the statements were not hearsay or were admissible under one of the hearsay exceptions, then the statements may be considered when examining whether a directed verdict in defendant's favor was warranted.

### 1. STANDARD OF REVIEW

A trial court's evidentiary decisions are reviewed for an abuse of discretion. *People v Manser*, 250 Mich App 21, 31; 645 NW2d 65 (2002). However, whether a rule or statute precludes admission of evidence is a matter of law and is reviewed de novo. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999). "[W]hen such preliminary questions of law are at issue, it must be borne in mind that it is an abuse of discretion to admit evidence that is inadmissible as a matter of law." *Id.* Hearsay evidence is generally inadmissible. MRE 802.

### 2. VIDEOTAPES

In his brief on appeal, defendant failed to clarify what objectionable statements were made on the videos, or even if any statements were made on the videotapes at all,[11] and failed to identify who made them.[12] Defendant also failed to explain how the allegedly inadmissible testimony prejudiced him. Because defendant failed to adequately brief the issue of the admissibility of the videotapes, he has abandoned this issue on appeal. See *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959) ("It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position.").

---

[11] In his brief on appeal, defendant merely asserted that the videotapes were "non-verbal statements" and later concluded that they were offered for the "truth of the statements contained therein without establishing first the conspiracy."

[12] Defendant did state that the videotapes may have been admissible against Brown or Bobby Martin, but fails to explain why they might be admissible against these defendants.

3. STATEMENTS OF BOBBY MARTIN

At trial, Angela Martin testified that she was the ex-wife of Bobby Martin, defendant's brother. Angela also testified that Bobby was paid by check and cash and stated that the managers of Legg's Lounge were paid a percentage of its profits. She testified that "Bobby was paid a thousand dollars cash a month, plus his check, plus his—our house payment was taken out of his pay . . . ." She also testified that Bobby told her that defendant "was paid 10 percent, which is what Bobby was paid when he worked at a different location [as a general manager]." She also stated that Bobby admitted knowing about sex acts being performed at Legg's Lounge. Finally, she testified concerning a telephone conversation between Bobby and defendant regarding the use of VIP cards at Legg's Lounge. On appeal, defendant argues that Angela Martin's testimony concerning the statements made by her former husband are inadmissible hearsay.

Hearsay is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). However, a statement is not hearsay if the statement is offered against a party and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy on independent proof of the conspiracy." MRE 801(d)(2)(E).

The proponent of evidence bears the burden of establishing its relevance and admissibility. *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 781; 685 NW2d 391 (2004). In order to qualify under the exclusion for statements by a coconspirator, the proponent of the statements must establish three things. First, the proponent must establish by a preponderance of the evidence that a conspiracy existed through independent

evidence. *People v Vega*, 413 Mich 773, 780; 321 NW2d 675 (1982). A conspiracy exists where two or more persons combine with the intent to accomplish an illegal objective. *People v Blume*, 443 Mich 476, 481-482; 505 NW2d 843 (1993). It is not necessary to offer direct proof of the conspiracy. *People v Justice (After Remand)*, 454 Mich 334, 347; 562 NW2d 652 (1997). Instead, it is "sufficient if the circumstances, acts, and conduct of the parties establish an agreement in fact." *People v Atley*, 392 Mich 298, 311; 220 NW2d 465 (1974), overruled on other grounds by *People v Hardiman*, 466 Mich 417, 428 (2002). Circumstantial evidence and inference may be used to establish the existence of the conspiracy. *People v Gay*, 149 Mich App 468, 471; 386 NW2d 556 (1986). Second, the proponent must establish that the statement was made during the course of the conspiracy. *People v Bushard*, 444 Mich 384, 394; 508 NW2d 745 (1993). The conspiracy continues "until the common enterprise has been fully completed, abandoned, or terminated." *Id.* Third, the proponent must establish that the statement furthered the conspiracy. *Id.* The requirement that the statement further the conspiracy has been construed broadly. *Id.* at 395. Although idle chatter will not satisfy this requirement, statements that prompt the listener, who need not be one of the conspirators, to respond in a way that promotes or facilitates the accomplishment of the illegal objective will suffice. *Id.*

Before Angela Martin testified, there were several witnesses who testified concerning the sexual activities at Legg's Lounge. Witnesses also testified that patrons were charged a fee to enter the bar and were charged an additional fee to go either upstairs or downstairs. The testimony established that to obtain access to the downstairs VIP room, which is where the sex acts occurred, a prospective patron first had to obtain a VIP

card. One dancer testified that dancers who wanted to work in the VIP room, where the dancer could earn more money by performing acts of prostitution, had to pay a $100 fee. Further testimony revealed that defendant managed Legg's Lounge and handled the money taken in by the bar. There was also testimony that Bobby Martin helped manage Legg's Lounge.

The foregoing testimony established by a preponderance of the evidence that defendant and Bobby Martin worked together to manage Legg's Lounge. The testimony further established that Legg's Lounge derived a portion of its profits from prostitution activities that occurred in the VIP room and that the activities were so pervasive that defendant and his coworkers had to have been not only aware of the activities, but knowing participants in the furtherance of such activities. Hence, there was sufficient evidence to raise an inference that defendant conspired with Bobby Martin to carry out an illegal objective, i.e., maintain Legg's Lounge as a house of prostitution, accept the earnings of prostitutes, and engage in a pattern of racketeering activity. See *Gay*, *supra* at 471.

It is clear that the statements of Bobby Martin, which were related by Angela, were made during the existence of the conspiracy. Hence, the only remaining question is whether the statements were in furtherance of the conspiracy. Angela's testimony concerning Bobby Martin's telephone conversation with defendant falls within the exclusion. The conversation was about the VIP cards necessary to access the downstairs area where acts of prostitution occurred. Thus, the conversation was clearly concerning the activities covered by the conspiracy. Likewise, Bobby Martin's statements to Angela regarding the financial compensation he and defendant earned from the bar were more than mere

idle chatter. See *Bushard, supra* at 395-396. The statements informed Angela regarding her collective stake with Bobby and defendant in the success of the conspiracy and served to foster the trust and cohesiveness necessary to keep Angela from interfering with the continued activities of the conspiracy. See *id.* Thus, this statement too was in furtherance of the conspiracy. Finally, although Bobby Martin's statement that he knew that sex acts were performed in the VIP room was not in furtherance of the conspiracy, this statement falls under the exception for statements against penal interest. See MRE 804(b)(3); *People v Beasley*, 239 Mich App 548, 553; 609 NW2d 581 (2000). Consequently, all these statements were either not hearsay by definition or subject to admission under an exclusion.

Defendant also claims that the statements by Bobby Martin cannot constitute statements by a coconspirator because Bobby Martin was acquitted of the racketeering charge, which was the only charge that alleged a conspiracy, before defendant's trial began. However, Bobby Martin's statements can be admitted as the statements of a coconspirator even absent a charge of conspiracy as long as "there is independent evidence of the required concert of action." *People v Ayoub*, 150 Mich App 150, 152; 387 NW2d 848 (1985). Hence, this argument is unavailing.

### C. DIRECTED VERDICT

We shall next address defendant's claim that the trial court should have directed a verdict in his favor.

This Court reviews de novo a trial court's decision on a motion for directed verdict to determine whether the prosecutor's evidence, viewed in the light most favorable to the prosecution, could persuade a rational trier of fact that the essential elements of the crime were

proven beyond a reasonable doubt. *People v Aldrich*, 246 Mich App 101, 122-123; 631 NW2d 67 (2001). This Court also reviews de novo the proper interpretation of a statute. *Macomb Co Prosecutor, supra* at 157. This Court begins the interpretation of a statute by examining the language of the statute itself. *Id.* at 158. The statute should be read in context to determine if an ambiguity exists. *Id.* If the language is not ambiguous, the court shall not construe it, but rather will enforce it as written. *Id.* Where ambiguity exists, "this Court seeks to effectuate the Legislature's intent through a reasonable construction, considering the purpose of the statute and the object sought to be accomplished." *Id.*

Defendant was charged with violating MCL 750.159i(1), which states that "[a] person employed by, or associated with, an enterprise shall not knowingly conduct or participate in the affairs of the enterprise directly or indirectly through a pattern of racketeering activity." A pattern of racketeering activity is defined to mean

> not less than 2 incidents of racketeering to which all of the following characteristics apply:
>
> (i) The incidents have the same or a substantially similar purpose, result, participant, victim, or method of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated acts.
>
> (ii) The incidents amount to or pose a threat of continued criminal activity.
>
> (iii) At least 1 of the incidents occurred within this state on or after the effective date of the amendatory act that added this section, and the last of the incidents occurred within 10 years after the commission of any prior incident, excluding any period of imprisonment served by a person engaging in the racketeering activity. [MCL 750.159f(c).]

Furthermore, "racketeering" is defined as

committing, attempting to commit, conspiring to commit, or aiding or abetting, soliciting, coercing, or intimidating a person to commit an offense for financial gain, involving any of the following:

* * *

(ee) A violation of section 452, 455, 457, 458, or 459, concerning prostitution. [MCL 750.159g.]

Consequently, in order to find defendant guilty of racketeering, the jury needed to find beyond a reasonable doubt that: (1) an enterprise existed, (2) defendant was employed by or associated with the enterprise, (3) defendant knowingly conducted or participated, directly or indirectly, in the affairs of the enterprise, (4) through a pattern of racketeering activity that consisted of the commission of at least two racketeering offenses that (a) had the same or substantially similar purpose, result, participant, victim, or method of commission, or were otherwise interrelated by distinguishing characteristics and are not isolated acts, (b) amounted to or posed a threat of continued criminal activity, and (c) were committed for financial gain.

Defendant erroneously concludes that Michigan's racketeering statute requires the prosecution to prove that an enterprise exists by proving (1) the existence of a common purpose, (2) a formal or informal organization of participants who function as a unit, and (3) an ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering activity. Defendant relies on *United States v Turkette*, 452 US 576, 583; 101 S Ct 2524; 69 L Ed 2d 246 (1981), which interpreted the analogous federal Racketeering Influenced and Corrupt Organizations Act (RICO), 18 USC 1961 *et seq.* However, our Supreme Court has specifically disapproved of the use of federal authorities to

construe Michigan's racketeering statute where the Michigan statute is not ambiguous. See *People v Guerra*, 469 Mich 966, 966; 671 NW2d 535 (2003). The statutory provision in question is not ambiguous and contains no such additional requirements. Instead, "enterprise" is defined to include

> an individual, sole proprietorship, partnership, corporation, limited liability company, trust, union, association, governmental unit, or other legal entity or a group of persons associated in fact although not a legal entity. Enterprise includes illicit as well as licit enterprises. [MCL 750.159f(a).]

At trial, witnesses testified that defendant managed or was employed at Legg's Lounge. Legg's Lounge is the assumed name for Garter Belt, Inc., and this entity meets the definition of an enterprise. MCL 750.159f(a). Therefore, the prosecution presented sufficient evidence for a jury to conclude that an enterprise existed and that defendant was employed by or associated with that enterprise.

Defendant also argues that the prosecution had to prove that defendant participated in the management or operation of the enterprise, which it failed to do. Defendant relies on *Reves v Ernst & Young*, 507 US 170, 182; 113 S Ct 1163; 122 L Ed 2d 525 (1993). However, *Reves* interpreted the federal RICO statute that makes it unlawful " 'for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . .' " *Id.* at 177, quoting 18 USC 1962(c). The Court focused its analysis on what constituted conducting or participating in the "conduct of such enterprise's affairs" and concluded that participating in the "conduct of such enterprise's affairs" denotes individuals with some part

in directing the enterprise's affairs. *Reves, supra* at 177-179. However, under Michigan's racketeering statute, it is unlawful for a person to "knowingly conduct or participate *in the affairs of the enterprise* . . . ." MCL 750.159i. There is no reference to conducting or participating in the "*conduct* of such enterprise's affairs." Hence, any level of participation in the affairs of the enterprise through a pattern of racketeering activity will suffice. Consequently, the prosecution was not required to demonstrate that defendant held a position of authority within the enterprise, but only that he conducted *or participated* in its affairs through a pattern of racketeering activity.

Likewise, contrary to defendant's contention, the prosecution was not required to prove that the enterprise itself intended to commit the predicate acts or that the various defendants conspired to violate MCL 750.452. MCL 750.159i(1) makes it illegal for a person employed by, or associated with, an enterprise from knowingly conducting or participating in the affairs of an enterprise directly or indirectly through a pattern of racketeering. Nothing within this prohibition requires the enterprise itself to commit the predicate acts. Further, while the prosecution may prove a racketeering violation by proving that defendant conspired to commit one of the predicate offenses, it may also establish a racketeering violation by proving that defendant actually committed the predicate offense. See MCL 750.159g. Therefore, defendant's argument that the prosecution had to prove that defendant conspired to violate MCL 750.452 in the same manner as the other defendants is also without merit.

The prosecution presented sufficient evidence that defendant knowingly conducted or participated in the affairs of Legg's Lounge directly or indirectly through a

pattern of racketeering activity, which included committing, attempting to commit, conspiring to commit or aiding or abetting the violation of MCL 750.452 and MCL 750.457.

Pursuant to MCL 750.452,

[a]ny person who shall keep, maintain or operate, or aid and abet in keeping, maintaining or operating a house of ill-fame, bawdy house or any house or place resorted to for the purpose of prostitution or lewdness shall be guilty of a felony, punishable by imprisonment in the state prison for not more than 5 years or by a fine of not more than 2,500 dollars.

Thus, under a plain reading, the prosecution had to prove: (1) that the place in question was (a) a house of ill-fame, or (b) a bawdy house, or (c) a house or place resorted to for purposes of prostitution or lewdness, (2) that the defendant kept, maintained or operated, or aided and abetted the keeping, maintaining, or operating of the house or place, and (3) that it was resorted to for the purpose of prostitution or lewdness. MCL 750.452.

The evidence at trial clearly established that prostitution occurred at Legg's Lounge. Furthermore, the pervasive nature of the acts of prostitution permitted an inference that Legg's Lounge was resorted to for the purposes of prostitution. Hence, the first and third elements were met. The prosecution also presented evidence that defendant was the general manager of Legg's Lounge and that he handled the money collected at Legg's Lounge and even took payment from at least one dancer who wanted access to the VIP area where prostitution was permitted. Likewise, there was testimony that defendant had the authority to control access to the VIP room. Defendant also monitored the activity at the bar through surveillance equipment and stored

the taped material at his home. Taken in the light most favorable to the prosecution, this evidence was sufficient to satisfy the second element. Consequently, the prosecution presented sufficient evidence that defendant committed the first predicate offense.

There is also evidence that defendant accepted the earnings of a prostitute. Pursuant to MCL 750.457,

[a]ny person who shall knowingly accept, receive, levy or appropriate any money or valuable thing without consideration from the proceeds of the earnings of any woman engaged in prostitution, or any person, knowing a female to be a prostitute, shall live or derive support or maintenance, in whole or in part, from the earnings or proceeds of the prostitution of said prostitute, or from moneys loaned or advanced to or charged against her by any keeper or manager or inmate of a house or other place where prostitution is practiced or allowed, shall be guilty of a felony . . . .

The elements of this offense are: (1) that defendant received money from a prostitute, (2) that defendant knew the woman was a prostitute when he took the money, (3) that defendant knew the money he received had been earned through prostitution, and (4) that the defendant did not give the prostitute anything of value in exchange. See CJI2d 20.35.

The prosecution presented ample evidence that dancers engaged in acts of prostitution in Legg's Lounge. There was also evidence that the dancers paid a higher fee for the privilege of gaining access to the area where the prostitution was permitted. When this evidence is coupled with the evidence of the extensive surveillance system defendant used to monitor the activities at the bar, the warning system put in place, the pervasive nature of the sex acts, and the conditions of the downstairs area in general, there is sufficient evidence that defendant knew that the dancers were performing acts

of prostitution and that they were using the proceeds to pay the higher fee charged for access to the VIP area. Furthermore, there was testimony that defendant handled the money paid by the dancers for access to the area where prostitution was permitted. Therefore, the first three elements were met.

Finally, while defendant did arguably provide the prostitutes with a safe and controlled environment within which to ply their trade, this did not constitute consideration within the meaning of the statute. The term "consideration" does not include the provision of goods and services that are intended to further or keep the prostitute engaged in the business of prostitution. *People v Hill*, 32 Mich App 404, 408; 188 NW2d 896 (1971). Because the provision of a safe place within which to perform acts of prostitution is the provision of a service in furtherance of the prostitute's business, it cannot constitute adequate consideration. *Id.* at 407-409. Thus, the prosecution presented sufficient evidence to support each of the elements of accepting the earnings of a prostitute in violation of MCL 750.457.

The prosecution presented sufficient evidence to prove each element of the predicate offenses and those offenses were clearly related and all had the same purpose of increasing the profits of Legg's Lounge. Furthermore, the illegal acts were carried on for a sufficient length of time to pose a continuing threat of illegal activity. Hence, the prosecution presented sufficient evidence to meet the requirement that defendant conducted or participated in the enterprise through a pattern of racketeering activity. MCL 750.159f(c). The only remaining element is that defendant committed, or aided or abetted the commission of, the predicate acts for financial gain. MCL 750.159g.

By creating an environment that fostered prostitution and accepting the payment of a higher fee from the dancers for access to the area where prostitution was permitted, defendant enhanced the profitability of Legg's Lounge. Further, the testimony of Angela Martin established that defendant received a percentage of the profits from Legg's Lounge. Hence, the increased profitability of the bar financially benefited defendant. Therefore, there was sufficient evidence that defendant was motivated by financial gain to meet the final element.

When viewed in the light most favorable to the prosecution, sufficient evidence was presented to persuade a rational trier of fact that the essential elements of racketeering and the predicate offenses were proven beyond a reasonable doubt. *Aldrich, supra* at 122-123. Consequently, the trial court did not err when it refused to grant a directed verdict in defendant's favor.

### V. LESSER INCLUDED OFFENSE INSTRUCTION

Defendant next argues that the trial court erred when it instructed the jury that it could consider the predicate offenses as lesser included offenses of racketeering even though defendant was not actually charged with those offenses. For the reasons stated under Issue I, we agree. However, because the jury did not convict defendant of the predicate offenses, but rather returned a verdict of guilty on the racketeering charge alone, we conclude that any error in the instruction was harmless. See *Lukity, supra* at 495-496. Therefore, there was no error warranting reversal.

### VI. CONSTITUTIONALITY OF MCL 750.159j

Defendant next argues that MCL 750.159j is unconstitutional because it permits the trial court to impose

criminal penalties based on findings not made by the jury. Specifically, defendant contends that MCL 750.159j permits the trial court to make findings of fact and, on the basis of those findings, to order defendant to forfeit property and pay the costs of investigation and prosecution contrary to the holdings in *Blakely v Washington*, 542 US 296; 124 S Ct 2531; 159 L Ed 2d 403 (2004), and *Apprendi v New Jersey*, 530 US 466; 120 S Ct 2348; 147 L Ed 2d 435 (2000). See also *United States v Booker*, 543 US 220; 125 S Ct 738; 160 L Ed 2d 621 (2005). This argument is without merit.

As a preliminary matter, we note that the trial court denied plaintiff's motion for forfeiture of defendant's residence.[13] Hence, to the extent that defendant's argument contends that MCL 750.159j is unconstitutional because it permits the trial court to order the forfeiture of property on the basis of findings not made by the jury, the issue is moot and we decline to address it. See *Federated Publications, Inc v City of Lansing*, 467 Mich 98, 112; 649 NW2d 383 (2002). Therefore, we shall limit our analysis to examining defendant's claim that the statute unconstitutionally permits a trial court to order a defendant to pay the costs associated with investigating and prosecuting the racketeering offense on the basis of findings not made by a jury.

The constitutionality of MCL 750.159j presents a question of law, which this Court reviews de novo. *McDougall v Schanz*, 461 Mich 15, 23-24; 597 NW2d 148 (1999). "Statutes are presumed to be constitutional and valid, and courts are to construe statutes as constitutional unless there is a clear showing of unconstitutionality." *People v Dewald*, 267 Mich App 365, 382; 705 NW2d 167 (2005).

---

[13] The trial court determined that the property in question, defendant's home, was not used as "a part of the course of the criminal activity." See MCL 750.159j(4).

MCL 750.159j in relevant part states:

> (1) A person who violates section 159i is guilty of a felony punishable by imprisonment for not more than 20 years or a fine of not more than $100,000.00, or both.
>
> (2) In addition to any penalty imposed under subsection (1), the court may do 1 or more of the following with respect to a person convicted under section 159i:
>
> (a) Order the person to pay court costs.
>
> (b) Order the person to pay to the state or local law enforcement agency that handled the investigation and prosecution the costs of the investigation and prosecution that are reasonably incurred.
>
> (3) The court shall hold a hearing to determine the amount of court costs and other costs to be imposed under subsection (2).

In *United States v Hall*, 411 F3d 651 (CA 6, 2005), the court addressed a defendant's argument that, under *Apprendi*, a criminal forfeiture had to be imposed by a jury using the "beyond a reasonable doubt" standard. *Id.* at 654. The court first noted that " 'the right to a jury verdict on forfeitability does not fall within the Sixth Amendment's constitutional protection' because criminal forfeiture concerns sentencing, not the elements of a crime." *Id.*, quoting *Libretti v United States*, 516 US 29, 49; 116 S Ct 356; 133 L Ed 2d 271 (1995). The court also noted that the federal right to have a jury determination of forfeitability is merely statutory in origin. *Id.* The court then explained:

> In the aftermath of *Apprendi,* [*supra*,] we were asked to consider whether the Sixth Amendment as interpreted in *Libretti* still permitted courts to make criminal forfeiture decisions using a preponderance standard. In *United States v. Corrado*, 227 F.3d 543 [CA 6, 2000], we rejected the argument that "the jury must decide the extent of forfeiture or that the district court, as the agreed trier of fact, must make factual determinations based on the 'beyond a

reasonable doubt' standard," 227 F.3d at 551, reasoning that *Apprendi* did not affect *Libretti*'s holding that criminal forfeitures are part of the sentence alone and as such "[t]here is no requirement under *Apprendi* . . . that the jury pass upon the extent of a forfeiture," *id.* at 550. To our knowledge, every other circuit to consider the issue after *Apprendi* has reached the same conclusion. . . .

Nor do we see anything in *Booker*, which extended *Apprendi* to the Sentencing Guidelines, that alters this conclusion. . . . The absence of a statutory maximum or any sort of guidelines system indicates that forfeiture amounts to a form of indeterminate sentencing, which has never presented a Sixth Amendment problem. [*Id.* at 654-655.]

Although *Hill* dealt with a criminal forfeiture provision, we find its analysis and conclusion applicable to MCL 750.159j(2). The penalty permitted by MCL 750.159j(2) is one of the several indeterminate penalties that a trial court may impose at sentencing on a defendant properly convicted of violating MCL 750.159i, and indeterminate sentencing systems are not subject to the requirements imposed by *Apprendi*, *Blakely,* and *Booker*. *Hall*, *supra* at 654-655; *People v Claypool*, 470 Mich 715, 730 n 14; 684 NW2d 278 (2004). Therefore, we conclude that defendant does not have a Sixth Amendment right to have a jury determine the amount of the costs incurred in investigating and prosecuting his racketeering violation. See *Hall*, *supra* at 655. Consequently, on that basis, MCL 750.159j(2) is not unconstitutional.

### VII. AMENDED SENTENCE

Defendant next argues that the trial court impermissibly amended defendant's sentence twice by assessing the costs of investigation and prosecution against defendant after the conclusion of sentencing. This argument is without merit.

On July 1, 2004, the prosecution moved the trial court for the imposition of court costs, costs for the police investigation, and forfeiture of defendant's residence and noticed the hearing for the same day as defendant's sentencing. Defendant's sentencing hearing was held on July 9, 2004. At the close of the hearing, the trial court sentenced defendant to three years' probation and ordered him to perform 200 hours of community service. The court then informed defendant of his automatic right to appeal. At no point during the hearing did the trial court address the prosecution's motion regarding costs and forfeiture. An order of probation was entered on the same day. On July 18, 2004, defendant filed a claim of appeal with this Court.[14] Hearings on the prosecution's motion for the imposition of the costs of investigation and forfeiture were held on September 24, 2004 and December 17, 2004. On January 14, 2005, the trial court entered an order granting the prosecution's motion in part and denying the motion in part. The last sentence of this order states, "THAT this Order concludes the sentencing in this case and is a final Order under MCR 7.202(7)(b)(ii)."[15]

Although defendant correctly notes that a trial court may not normally set aside or amend a judgment or order appealed from except under limited circumstances, see MCR 7.208(A), a "final judgment" or "final order," as that term is defined under MCR 7.202(6), had not yet been entered in defendant's case. Therefore, defendant's claim was not properly filed within the meaning of MCR 7.208(A). The final order in defen-

---

[14] On January 18, 2005, defendant submitted a stipulated dismissal of his appeal in Docket No. 257507 and the appeal was dismissed on January 20, 2005. See *People v Martin*, unpublished order of the Court of Appeals, entered January 20, 2005 (Docket No. 257507).

[15] MCR 7.202(7)(b)(ii) has since been renumbered MCR 7.202(6)(b)(ii).

dant's case was entered on January 14, 2005. There-
fore, defendant's claim that the trial court impermissi-
bly amended his sentence by imposing the costs of the
investigation against him is without merit.

Likewise, defendant's claim that the trial court could
not order defendant to compensate the prosecutor for
the $1,170 in costs incurred in response to defendant's
motion for a new trial is without merit. A trial court
"may rule on requests for costs or attorney fees under
MCR 2.403, 2.405, 2.625 or *other law* or court rule,
unless the Court of Appeals orders otherwise." MCR
7.208(I) (emphasis added). Hence, the trial court had
the authority to order defendant to pay further costs, as
permitted by MCL 750.159j(2), after the entry of a final
judgment or order.

Defendant also contends that the trial court could
not assess such costs without conducting an evidentiary
hearing or permitting discovery and without requiring
affidavits. This argument too is without merit.

On September 24, 2004, the trial court heard argu-
ments on plaintiff's motion for the imposition of costs
and for forfeiture of defendant's home. At that hearing,
the prosecutor informed the court that she had her
witnesses and was prepared to proceed with an eviden-
tiary hearing. The court responded that it thought that
it had informed the prosecutor to submit written evi-
dence of the costs. Defendant's attorney then inter-
jected that he had subpoenaed five officers involved in
the investigation in order to depose them. However, the
court indicated that it would not permit lengthy inquir-
ies into whether the officers did or did not actually work
the listed number of hours. The court explained:

> Right. See what I wanted to do is for you to come with
> the costs and support that cost by accompanying documen-
> tation, to supply it with them for them to make whatever

> objections that they were going to make; to forward those objections to you; for them to at least agree that the cost of prosecution was worth something; and for, then, them to come with the bottom number; you to come with your number; and if there's any information that I need in order to help resolve or clear up any gray area that I might have, then I would ask.

For this reason the court adjourned the motion hearing to a later date. On September 30, 2004, the prosecution submitted a brief and exhibits in support of its request for costs.

On December 17, 2004, the trial court resumed the hearing on plaintiff's motion for the taxation of costs and the forfeiture of defendant's home. As an initial matter, the trial court stated that it was denying the prosecution's motion to forfeit. The court also stated that it had assessed the written documentation submitted and determined that the prosecuting attorney had stated a reasonable hourly rate, but reduced the number of hours stated from 240 to 140 on the basis of a determination that some of the hours appeared to be for work performed in the prosecution of defendants other than defendant and Frasure, who also appeared at the hearing. The trial court also stated that it accepted the figures for the costs incurred by the various police departments in investigating the crime. Finally, the trial court ordered both defendant and Frasure to pay one-half the total amount.

Although defendant argues that the trial court never held the evidentiary hearing required by MCL 750.159j(3), it is clear that the trial court held two hearings regarding the prosecution's motion for costs. Further, MCL 750.159j(3) does not require an *evidentiary* hearing, but rather states that the trial court shall hold "a hearing" to determine the amount of costs. Hence, defendant's argument is really an argument

concerning the sufficiency of the hearing held on December 17, 2004. However, defendant has not presented any evidence that the figures relied on by the court were inaccurate and does not argue that he was deprived of the opportunity to present his position to the court, present evidence, call witnesses, or confront the witnesses against him. Indeed, defendant does not even state that he was prejudiced by the trial court's alleged error. Consequently, defendant has abandoned this argument on appeal. See *Mitcham*, *supra* at 203.

### VIII. SEVERED TRIAL

Defendant Billy Martin next argues that he was deprived of the right to a fair trial when the trial court effectively "severed" the defendants' trials by limiting their ability to call and cross-examine the defendants' witnesses. This argument is without merit.

On June 10, 2004, after the people rested and the trial court heard defendant's motion for a directed verdict, the trial court explained how defendants would be asked to proceed with their cases-in-chief:

> Good people, there are three people charged with three separate considerations, three separate defenses. So Mr. McQueeney [Billy Martin's trial counsel] is the first person up. This is the way we're going to handle this. This is kind of like score board. Because it's his first opportunity to present whatever witnesses, he will do that. Now, if it just so happens that Mr. Donaldson or Mr. Murphy would call those people also for the defense of their clients, instead of him just calling them, then they leave until it's—we're just going to allow each one of them that would use that person to question them, and it would be just the same as if it were—they were calling them. So it would be direct examination. They don't get to cross-examine each others witnesses. The cross-examination, if there's a need to be done, can be done by the assistant attorney general. Okay?

Do we understand?

Defendant's trial counsel did not object at that point to the procedure outlined by the trial court. Instead, defendant's trial counsel called and directly examined 11 witnesses.

On the next trial day, June 14, 2004, before defendant rested his case-in-chief, defendant's trial counsel elected to present an objection. The following exchange occurred outside the presence of the jury:

*Mr. McQueeney*: Judge, can I address the Court before you bring the jurors out on an issue that came up with your procedural order from last week? You've asked that I put on my proofs, and I'm in the midst of doing so, and you've allowed Mr. Murphy and Mr. Donaldson, on behalf of Mr. Hamilton and Mr. Frasure, if they so desire, to question my witnesses and the list of potential evidence that they may use in their cases before the jury.

My question to you is when I close my proofs, will I be afforded the same ability that they've been afforded on behalf of Mr. Billy Martin? For example—

*The Court*: No, you won't. And the reason why you won't is the only reason I'm allowing them is to not bring the witnesses back and forth. See because if you were only allowed to question them, then the witnesses would leave and they would have to come back on another day when Mr. Donaldson did his defense, and when Mr. Martin—if Mr. Murphy chose to use him for a defense—it's for a convenience of the first witness being called. It's not for any other convenience, period. It's just for the convenience of citizens so they don't have to keep coming back here, paying for parking, and taking more time. So you need to roll out of whatever it is that you want to roll out for your case.

*Mr. McQueeney*: With all due respect, on behalf of Mr. Martin, I think that prejudiced his case, but I will—

*The Court*: How so, sir? That's a nice way to say something, but you haven't demonstrated anything to base

that conclusion on. How does it prejudice this case if you have the ability to call whomever it is that you want to call?

*Mr. McQueeney*: Well, first of all, Judge, each of them have named nearly, between the both of them, in excess of 200 witnesses and—

*The Court*: Okay. And you can call them all. You're not being restricted in any way, shape, or form; and if there is a restriction, you need to tell me about it. Who's restricted you in calling any witness?

*     *     *

*Mr. McQueeney*: Well, it just seems that these two—the —because of the order that you've set forth, it just seems like the two other defendants have benefited from the order that you've established. . . .

After defendant's trial counsel stated his objection, the trial court restored the normal procedure for calling witnesses and agreed to explain the change to the jury.

As can be seen, at no point did the trial court sever the trial. Instead, the trial court attempted to exercise its discretion to determine the mode and order of interrogation of witnesses. Because defendant failed to object to the procedure in place for his first 11 witnesses, his claim of error for this period is unpreserved. Furthermore, because the trial court sustained defendant's objection when he finally made it, there was no error thereafter. Consequently, we shall review defendant's claim for plain error affecting defendant's substantial rights. See *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

The trial court has broad discretion to control the manner in which witnesses are called. MRE 611(a); MCL 768.29; *Phillips v Deihm*, 213 Mich App 389, 402; 541 NW2d 566 (1995). In the present case, the trial court attempted to modify the order in which defen-

dants called their witnesses in order to save time and expense on the part of the witnesses. Although the manner specified by the court might have benefited the other defendants by giving them a preview of defendant's witnesses, it is not plain or obvious that the limitation was erroneous. Furthermore, because the trial court corrected the perceived error before defendant had finished presenting his case-in-chief, defendant cannot demonstrate that any error prejudiced him. Therefore, there was no plain error affecting defendant's substantial rights. *Carines, supra* at 763.

### IX. INSTRUCTIONAL ERRORS

Finally, defendant Billy Martin argues that the trial court committed various instructional errors.[16] Defendant claims that the trial court erred (1) when it failed to give the jury an enhanced unanimity instruction regarding the alternate methods of violating MCL 750.452, (2) when it instructed the jury that the racketeering predicate offenses were lesser included offenses of racketeering, and (3) when it denied defendant's request for an instruction regarding the personal responsibility of a corporate agent. Each of these issues is without merit.

This Court reviews de novo claims of instructional error. *People v Perez*, 469 Mich 415, 418; 670 NW2d 655 (2003). In reviewing a claim of instructional error, "this Court examines the instructions as a whole, and, even if there are some imperfections, there is no basis for

---

[16] We note that the statement of the questions presented for this issue is confusing and repetitious. Likewise, the arguments in support of the various subissues are unclear. Therefore, we shall limit our analysis to those arguments that were properly addressed in defendant's brief on appeal. The remaining arguments, if any, are deemed abandoned. *Mitcham, supra* at 203.

reversal if the instructions adequately protected the defendant's rights by fairly presenting to the jury the issues to be tried." *People v Dumas*, 454 Mich 390, 396; 563 NW2d 31 (1997) (opinion by RILEY, J.). It is an error of constitutional magnitude to omit an instruction on an element of a crime. *Carines*, *supra* at 761, citing *United States v Gaudin*, 515 US 506, 510; 115 S Ct 2310; 132 L Ed 2d 444 (1995). This Court also reviews de novo the proper interpretation of a statute. *Macomb Co Prosecutor*, *supra* at 157.

We shall first address defendant's contention that the trial court should have given the jury an enhanced unanimity instruction regarding the alternate methods of violating MCL 750.452.

A defendant has the right to a unanimous verdict and it is the duty of the trial court to properly instruct the jury on this unanimity requirement. *People v Cooks*, 446 Mich 503, 511; 521 NW2d 275 (1994). It is undisputed that the trial court gave the jury a general unanimity instruction at defendants' trial. Under most circumstances, a general instruction on the unanimity requirement will be adequate. *Cooks*, *supra* at 524. However, the trial court must give a specific unanimity instruction where the state offers evidence of alternative acts allegedly committed by the defendant and "1) the alternative acts are materially distinct (where the acts themselves are conceptually distinct or where either party has offered materially distinct proofs regarding one of the alternatives), or 2) there is reason to believe the jurors might be confused or disagree about the factual basis of defendant's guilt." *Id.*

In the present case, the prosecution alleged that defendant either kept or aided and abetted the keeping of a house of ill-fame, a bawdy house, or a house or place resorted to for the purpose of prostitution or lewdness.

In order to prove its case, the state presented evidence that defendant assisted in the operation of Legg's Lounge and knowingly facilitated the acts of prostitution committed by the dancers who worked there. In his defense, defendant argued that the acts of prostitution that occurred were isolated incidents perpetrated without his knowledge. Defendant did not contest the nature of the acts themselves (i.e., argue that the acts were lewd as opposed to acts of prostitution). Hence, the record does not support the conclusion that materially distinct proofs of alternative acts were offered. Therefore, on the record presented, the trial court did not err by failing to give the jury a specific unanimity instruction.

Finally, regarding defendant's second claim of instructional error, we have already determined that the trial court committed harmless error when it instructed the jury that it could convict defendant of the predicate offenses of racketeering as lesser included offenses. See Issue V above. Likewise, because the claim of error was inadequately briefed, see *Mitcham, supra* at 203, we decline to address defendant's argument that the trial court should have given the jury the 7th Circuit Court of Appeals Pattern Jury Instruction on the personal responsibility of a corporate agent.

There were no instructional errors warranting reversal of defendant Billy Martin's conviction.

### X. SUFFICIENCY OF THE EVIDENCE OF RACKETEERING

In Docket No. 261088, defendant Frasure first argues that there was insufficient evidence to establish that he violated Michigan's racketeering statute or accepted the earnings of a prostitute. Specifically, he contends that there was no evidence that he held a position of authority within the enterprise and that there was insufficient evidence that he acted for financial gain.

Defendant also argues that there was insufficient evidence from which a jury could conclude that he knew that the money he received from the dancers was from the proceeds of prostitution and that he received this money without consideration. Defendant's arguments are without merit.

### A. STANDARD OF REVIEW

We review de novo challenges to the sufficiency of the evidence. *People v Sherman-Huffman*, 241 Mich App 264, 265; 615 NW2d 776 (2000). When reviewing a sufficiency of the evidence claim in a criminal case, "this Court views the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could have found the essential elements of the crime were proved beyond a reasonable doubt." *People v Moorer*, 262 Mich App 64, 76-77; 683 NW2d 736 (2004), citing *People v Nowack*, 462 Mich 392, 399-400; 614 NW2d 78 (2000). The standard is deferential and requires that this Court "draw all reasonable inferences and make credibility choices in support of the jury verdict." *Nowack, supra* at 400. Hence, all conflicts in the evidence must be resolved in favor of the prosecution. *People v Terry,* 224 Mich App 447, 452; 569 NW2d 641 (1997). "Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *Nowack, supra* at 400 (internal quotations omitted), quoting *Carines, supra* at 757. Further, the prosecution need not "negate every reasonable theory consistent with innocence." *Id.*, citing *People v Konrad*, 449 Mich 263, 273 n 6; 536 NW2d 517 (1995).

### B. ANALYSIS

Defendant's first contention is that the prosecutor "utterly failed to show that Frasure was anything more

than a disc jockey at Legg's Lounge." Hence, defendant concludes, the prosecution failed to present evidence sufficient to establish that he participated in the management of the enterprise. This argument is unavailing.

Defendant relies on *Reves, supra,* for the proposition that the prosecutor was required to prove that defendant participated in the management of the enterprise. However, as noted above under Issue IV, section C, Michigan's racketeering statute does not criminalize participation in the management of the enterprise, but rather criminalizes the participation "in the affairs of the enterprise directly or indirectly through a pattern of racketeering activity." MCL 750.159i(1). Hence, the prosecution need only have presented sufficient evidence from which a rational trier of fact could have concluded that defendant participated in the affairs of the enterprise.

Defendant also argues that the prosecution failed to present evidence that he acted for financial gain, as required under the racketeering statute. We disagree.

In order for a predicate offense to constitute racketeering, the offense must be committed for financial gain. MCL 750.159g. As discussed below, the prosecution presented sufficient evidence from which a jury could conclude that defendant committed both predicate offenses for financial gain.

Defendant also contends that there was insufficient evidence from which the jury could conclude beyond a reasonable doubt that he knew that the money he received from the dancers was from the proceeds of prostitution and that he received this money without consideration.

In order to prove that defendant accepted the earnings of a prostitute in violation of MCL 750.457, the prosecution had to prove beyond a reasonable doubt (1)

that defendant received money from a prostitute, (2) that defendant knew the woman was a prostitute when he took the money, (3) that defendant knew the money he received had been earned through prostitution, and (4) that the defendant did not give the prostitute anything of value in exchange. See MCL 750.457; CJI2d 20.35.

At trial, several witnesses testified regarding the pervasive use of the downstairs VIP room by dancers for the purpose of engaging in prostitution. In addition, there was testimony regarding the surveillance system used to monitor activities at the bar, including activities in the downstairs area. This testimony established that some of the monitors for the surveillance system were located at the DJ's booth. Testimony also established that defendant was a DJ at Legg's Lounge. In addition, one of the dancers testified that she actually observed defendant watch the monitors while the monitors were displaying sex acts. Another dancer testified that defendant told her that she could touch and be touched in the downstairs area. In addition, one dancer testified that defendant informed her about the warning system and told her that sexual activity had to stop when the alarm went off. She also stated that defendant told her that it was the dancers' responsibility to clean up their own messes and that he must have known of the sex acts because dancers would come up from the downstairs area and ask him for napkins to wipe their genitals. This evidence was sufficient for a jury to conclude that defendant knew that the dancers who worked in the downstairs VIP room were performing sex acts in exchange for money, i.e., that they were prostitutes, and that the money they received from working there was the proceeds of prostitution.

A dancer also testified that dancers typically tipped the DJ ten percent of their earnings, but that such

tipping was not required. This same dancer stated that it was no secret that dancers performed sex acts in the downstairs VIP area and that defendant knew where the money came from. She even testified that defendant would set her up with men and that she would tip him above and beyond the normal amount when he did so. At least one other dancer testified that she directly tipped defendant. Hence, there was also evidence that defendant received money that he knew was earned from prostitution.

Finally, defendant claims that he performed DJ services for the dancers in exchange for his tips and, therefore, that he did not receive the earnings of a prostitute without consideration. As noted above, the term "consideration" does not include the provision of goods and services that are intended to further or keep the prostitute engaged in the business of prostitution. *Hill, supra* at 408. Testimony established that, although it was not required to tip the DJ, a dancer would be treated better if she tipped him. One dancer explained that the DJ would listen to you and play the songs you wanted. Likewise, as was already noted, a dancer testified that defendant would actually set her up with clients and that she would tip him more when he did so. From this evidence, the jury could conclude that defendant provided services to the prostitutes that were intended to further or keep the prostitute engaged in the business of prostitution. Thus, the jury could conclude that defendant did not provide the dancers who performed prostitution with consideration within the meaning of MCL 750.457. Consequently, viewing this evidence in the light most favorable to the prosecution, there was sufficient evidence from which a rational trier of fact could have found that the essential elements of the crime of accepting the earnings of a prostitute were proved beyond a reasonable doubt.

This same evidence supports a finding that defendant committed the predicate offenses for financial gain. The evidence indicated that the dancers tipped defendant ten percent of their total take for the shift they worked. Hence, if the dancers earned more money, defendant received more tips. By creating an environment where it was safe and efficient for the dancers to offer sex acts for money and for patrons to obtain sex acts for money, defendant indirectly increased the revenues generated by the dancers who performed sex acts and, thereby, profited as well. Consequently, a rational trier of fact could conclude from the evidence presented that defendant accepted the earnings of a prostitute and helped to maintain Legg's Lounge as a house of prostitution for financial gain.

### XI. ORDER OF DELIBERATION

Defendant next argues that the trial court's instruction regarding the order of deliberation constituted error warranting reversal. Specifically, defendant claims that the trial court ordered the jury to consider the racketeering charge first and then, only if the jury unanimously agreed that defendant was not guilty of that offense, should the jury proceed to consider the lesser included offenses. This argument is without merit. As already noted above under Issue I, the predicate offenses of a racketeering charge are not necessarily lesser included offenses. Hence, defendant was not entitled to have the jury consider the predicate offenses as lesser offenses of the racketeering charge. Therefore, there was no error warranting reversal.

### XII. CORPORATE AGENT INSTRUCTION

Defendant next contends that the trial court erred when it refused to instruct the jury with the 7th Circuit

Court of Appeals Pattern Criminal Jury Instruction 5.02, which reads:

> A person is responsible for conduct that he performs or causes to be performed in behalf of a corporation just as though the conduct were performed in his own behalf. However, a person is not responsible for the conduct of others performed in behalf of a corporation merely because that person is an officer, employee, or other agent of a corporation.

"When a defendant requests a jury instruction on a theory or defense that is supported by the evidence, the trial court must give the instruction." *People v Riddle*, 467 Mich 116, 124; 649 NW2d 30 (2002). "However, if an applicable instruction was not given, the defendant bears the burden of establishing that the trial court's failure to give the requested instruction resulted in a miscarriage of justice." *Id.* Defendant was charged with offenses based on his own conduct and not the conduct of other persons employed by Legg's Lounge. Hence, there was no reason to believe that the jury would convict him merely because he was associated with Legg's Lounge. Consequently, there was no need to give the requested instruction.

### XIII. INSTRUCTIONAL ERRORS FOR KEEPING A HOUSE OF PROSTITUTION

Relying on *People v Mayes*, 44 Mich App 482; 205 NW2d 212 (1973), defendant next argues that there are three distinct ways of violating MCL 750.452. Therefore, defendant reasons, the trial court should have instructed the jury on the distinct elements of each method of violating the statute. Defendant also argues that the trial court should have defined certain key terms. These errors, defendant concludes, warrant reversal. We disagree.

This Court reviews de novo claims of instructional error. *Perez, supra* at 418. This Court also reviews de novo the proper interpretation of a statute. *Macomb Co Prosecutor, supra* at 157. It is an error of constitutional magnitude to omit an instruction on an element of a crime. *Carines, supra* at 761.

Pursuant to MCL 750.452,

[a]ny person who shall keep, maintain or operate, or aid and abet in keeping, maintaining or operating a house of ill-fame, bawdy house or any house or place resorted to for the purpose of prostitution or lewdness shall be guilty of a felony, punishable by imprisonment in the state prison for not more than 5 years or by a fine of not more than 2,500 dollars.

Relying in part on *Mayes, supra*, defendant contends that this language indicates that there are three ways of violating the statute, each of which has distinct elements. According to defendant, the elements of keeping a house of ill-fame are (1) that there was a house of ill-fame, which requires proof of reputation, (2) that it was commonly resorted to for the purpose of prostitution, (3) that at least one act of prostitution occurred there, and (4) that the defendant kept, maintained, or operated it. Defendant further contends that the elements of keeping a bawdy house are identical to those for keeping a house of ill-fame, except that reputation need not be proven. Finally, defendant contends that the elements for keeping a house or place resorted to for purposes of prostitution or lewdness are the same as for a bawdy house except that the house or place may be resorted to for the purpose of prostitution or lewdness as opposed to prostitution alone. We disagree that there are distinct elements for keeping a house of ill-fame, a bawdy house, or any house or place resorted to for purposes of prostitution or lewdness.

In *Mayes*, the defendant was originally charged with violating MCL 750.452. However, because the prosecution presented no evidence that the premises controlled by the defendant had a reputation in the community, the trial court quashed that part of the charge dealing with operating or maintaining a house of ill-fame. *Mayes*, *supra* at 482-483. The defendant later pleaded guilty, but reserved the right to appeal from the partial quashing. *Id.* at 483. On appeal, the defendant argued that reputation was an essential element of MCL 750.452, but this Court disagreed, explaining that the use of the disjunctive within the statute indicated that "a violation of the statute occurs whenever a person operates or maintains (1) a house of ill-fame, *or* (2) a bawdy house, *or* (3) a house or place resorted to for the purpose of prostitution." *Id.* The Court then concluded that the trial court correctly determined that reputation was only an essential element when operating or maintaining a house of ill-fame is charged. *Id.* Hence, although *Mayes* indicated that there were three distinct ways of violating MCL 750.452, it did not directly address whether there were distinct elements to each of the three apparently alternate methods of violating MCL 750.452.[17] Instead, it only held that reputation is an essential element of the offense of maintaining or operating a house of ill-fame. However, neither the plain language of the statute nor its historical application supports the conclusion that there are separate elements for each of the ways to violate MCL 750.452.

Earlier versions of this statute criminalized the keeping of a house of ill-fame without reference to bawdy houses[18] or to any house or place resorted to for the

---

[17] We further note that *Mayes* did not deal with instructional error.

[18] Like a house of ill-fame, a bawdy house was a house that was resorted to for purposes of prostitution. *People v Lee*, 307 Mich 743, 751; 12 NW2d

purpose of prostitution or lewdness.[19] See, e.g., 1929 CL 16826 and How 9286. Under these statutes the prosecution had to prove that (1) the house was a house of ill-fame, (2) that the defendant kept it, and (3) that it was resorted to for the purpose of prostitution or lewdness. *People v Hanrahan*, 75 Mich 611, 613; 42 NW 1124 (1889); *People v Gastro*, 75 Mich 127, 129; 42 NW 937 (1889); *People v Russell*, 110 Mich 46, 50; 67 NW 1099 (1896). Defendant is mistaken when he concludes that keeping a house of ill-fame requires proof that the house of ill-fame was resorted to for the purpose of prostitution alone rather than prostitution or lewdness. The original statutes criminalizing the keeping of a house of ill-fame specifically state that the house of ill-fame must be resorted to for purposes of prostitution *or lewdness*. See 1929 CL 16826, *Hanrahan, supra* at 613, quoting How 9286.

When the Legislature enacted 1931 PA 328, § 452, it elected to retain the reference to houses of ill-fame, which, under the previous statute, were places resorted to for the purpose of prostitution *or lewdness*. However, it also added a reference to bawdy houses. The adjective "bawdy" means "indecent or lewd," and a "bawdy house" is defined as a brothel, which in turn is defined as a "house of prostitution." See *Random House Webster's College Dictionary* (1992). Hence, a bawdy house is a place resorted to for either prostitution or lewdness. This construction is further bolstered by the statutory

---

418 (1943), *State v Hesselmeyer*, 343 Mo 797, 806; 123 SW2d 90 (1938). However, in contrast to a house of ill-fame, a bawdy house apparently did not have to be notorious in the local community. See *Hesselmeyer, supra* at 805.

[19] The current language of the statute, which criminalizes the keeping of a house of ill-fame, bawdy house, or any house or place resorted to for the purpose of prostitution or lewdness, was first enacted in 1931. See 1931 PA 328, § 452.

reference to *"any* house or place resorted to for the purpose of prostitution *or lewdness."* MCL 750.452 (emphasis added). By placing this reference immediately after the references to houses of ill-fame and bawdy houses, the Legislature indicated that houses of ill-fame and bawdy houses were among the class of houses resorted to for the purpose of prostitution *or lewdness.* Consequently, although the modern statute continues to criminalize the keeping of a house of ill-fame, the definition of which includes a bad reputation, see *Mayes, supra* at 483, the statute's overarching purpose is to criminalize the keeping, maintaining, or operating of houses that are resorted to for the purpose of prostitution or lewdness. Therefore, MCL 750.452 constitutes a single offense with the following elements: (1) that the place in question was (a) a house of ill-fame, or (b) a bawdy house, or (c) any house or place resorted to for purposes of prostitution or lewdness, (2) that the defendant kept, maintained or operated, or aided and abetted the keeping, maintaining, or operating of the house or place, and (3) that it was resorted to for the purpose of prostitution or lewdness.[20]

At defendants' trial, the court instructed the jury as follows:

> So going back again. One of the predicates—one of the predicate offenses is that they did keep, maintain, operate,

---

[20] Defendant contends that the prosecution must prove that the house or place in question was "commonly" resorted to for the purpose of prostitution or lewdness. However, the statute contains no such language and we decline to read it into the statute. Furthermore, the Court in *People v Pinkerton*, 79 Mich 110, 115; 44 NW 180 (1889), did not hold that the prosecution must prove that the house was commonly resorted to for purposes of prostitution, but rather noted that, under the facts of the case before it, a single act was insufficient to make the showing that "the house was 'resorted to,' " which the Court explained meant "something of a common occurrence . . . ."

or aid and abet in the keeping, maintaining, or operating a
house of ill fame, bawdy house, or place at 50778 Michigan
Avenue, resorted to for the purpose of prostitution or
lewdness. I've already kind of explained the theory of
aiding and abetting and conspiracy, and now we go to the
elements necessary for operation or maintaining a house of
ill fame.

The prosecution must prove first that Legg's Lounge
was a house of ill fame, bawdy house, or place resorted to
for the purpose of prostitution or lewdness. You may
conclude that a house of ill fame exists where sex is sold for
money; two, that the defendant either kept, maintained,
operated, and or aided and abetted the keeping, maintain-
ing, or operating of a house of ill fame, bawdy house, or
place resorted to for the purpose of prostitution or lewd-
ness, and that Legg's Lounge was resorted to for the
purpose of prostitution and lewdness. You may conclude
that prostitution exists where a male or female gets paid to
perform sex acts. They include intercourse, [cunnilingus],
fellatio, or manual manipulation of a penis for sexual
release.

The trial court properly instructed the jury that, in
order to meet the first element, it must first find that
Legg's Lounge was a house of ill-fame, bawdy house, or
house or place resorted to for the purpose of prostitu-
tion or lewdness. However, defendant contends that the
instruction that the jury could "conclude that a house of
ill fame exists where sex is sold for money" erroneously
led the jury to believe that a house of ill-fame may be
found without proof of reputation or proof that it was
resorted to for the purpose of prostitution or lewdness.
We note that defendant did not object to the instruction
on this basis. Therefore, we shall review this claim of
error for plain error affecting defendant's substantial
rights. *Carines, supra* at 763.

Taken in context, the instruction that the jury may
conclude that a house of ill-fame exists where sex is sold

for money is not inherently inaccurate. In the last sentence of the first paragraph quoted above, the trial court used "house of ill-fame" as a shorthand reference for the entire offense. Understood in this context, the reference to a house of ill-fame alone is a reference to each of the alternate methods of meeting the first element. This understanding is further bolstered by the fact that the instruction immediately follows the recitation of the first element of the offense, where the trial court accurately stated that the jury must find that Legg's Lounge was a house of ill-fame, bawdy house, or house or place resorted to for the purpose of prostitution. Hence, it refers to the jury's ability to conclude that Legg's Lounge was in fact a house of ill-fame, bawdy house, or house or place resorted to for the purpose of prostitution or lewdness on the basis of evidence that prostitution regularly occurred there. It did not relieve the jury of its duty to find the remaining elements, which were recited immediately thereafter. Further, at trial, there was overwhelming evidence that prostitution regularly occurred at Legg's Lounge. Hence, the primary issue was not whether the first element was met, but rather whether defendant had knowledge of the prostitution that occurred and profited from it. Therefore, although the instruction erroneously suggested that the jury could determine that Legg's Lounge was a house of ill-fame without proof of reputation, to the extent that this instruction misled the jury, this unpreserved error was harmless. Consequently, although the instruction was poorly worded, it does not by itself warrant reversal.

The trial court also accurately stated that, in order to convict defendant of keeping a house of prostitution, it must also find that defendant "kept, maintained, operated, and or aided and abetted the keeping, maintaining, or operating of a house of ill fame, bawdy house, or

place resorted to for the purpose of prostitution or lewdness, and that Legg's Lounge was resorted to for the purpose of prostitution and lewdness." Thus, the trial court fairly presented the second and third elements of the offense. Therefore, these instructions adequately protected defendant's rights by fairly presenting the elements of keeping a house of prostitution in violation of MCL 750.452. *Dumas, supra* at 396.

Defendant also argues that the trial court erred when it failed to define "house of ill-fame," "bawdy house," "to keep," "to maintain," or "to operate." The trial court did not need to specifically define these terms. When a word is not defined by statute, this Court presumes that the word is subject to ordinary comprehension and there will be no error warranting reversal as a result of a trial court's failure to define a term that is generally familiar to lay persons and is susceptible of ordinary comprehension. *People v Knapp*, 244 Mich App 361, 376-377; 624 NW2d 227 (2001).

According to *Random House Webster's College Dictionary* (1992), the ordinary meaning of the word "fame" is "widespread reputation" and the word "ill," as in *ill repute*, can mean "evil" or "wicked." Hence, the common meaning of the term "house of ill-fame" is a house with a widespread reputation for evil or wickedness. This definition is consistent with the statute, encompasses reputation, and is susceptible of ordinary comprehension. Therefore, there was no need to define it or otherwise incorporate it as an element. Likewise, the term "bawdy house" is defined as "a brothel," which in turn is defined as a "house of prostitution." *Random House Webster's College Dictionary* (1992). Thus, "bawdy house" is susceptible of ordinary comprehension. Finally, the ordinary meanings of "keep," "main-

tain," and "operate" are self-evident. Because these terms are all susceptible of ordinary comprehension, the trial court may not be faulted for failing to define them.

The trial court did not commit any errors warranting reversal when instructing the jury on the elements of keeping a house of prostitution.

### XIV. RACKETEERING INSTRUCTIONAL ERRORS

Finally, defendant Frasure argues that the trial court made several errors when instructing the jury on the elements of racketeering, conspiracy to commit racketeering, and aiding and abetting the commission of racketeering. We disagree that there were any instructional errors warranting reversal.

This Court reviews claims of instructional error de novo. *Perez, supra* at 418. Because defendant failed to properly preserve these claims of error with an objection in the trial court, we shall review them for plain error affecting defendant's substantial rights. *Carines, supra* at 763.

Defendant first argues that the trial court erroneously instructed the jury that it could find defendant guilty of violating Michigan's racketeering statute if it determined that he committed only one of the predicate offenses. The instruction defendant claims to be error reads as follows:

> Racketeering, for purposes of the charged crime against the defendants in this case means committing, attempting to commit, conspiring to commit, or aiding and abetting, soliciting, coercing, or intimidating a person to commit an offense for gain; involving the accepting [of] money from a prostitute and/or as the other predicate act, maintaining a house of ill fame.

This instruction is substantially similar to the statutory definition of "racketeering." The relevant portion of MCL 750.159g reads: "As used in this chapter, 'racketeering' means committing, attempting to commit, conspiring to commit, or aiding or abetting, soliciting, coercing, or intimidating a person to commit an offense for financial gain . . . ." Defendant's objection centers on the use of "and/or" when describing the predicate offenses that may support racketeering. However, taken in the context of the whole instruction, it is clear that the reference to "and/or" refers to the manner of proving that the predicate offenses were committed and were not an instruction that the pattern of racketeering element could be met by proving only one predicate offense.

In the information charging defendant with the racketeering violation, the prosecution alleged that defendant conducted or participated in the affairs of the enterprise directly or indirectly through a pattern of racketeering activity that consisted of (1) committing, conspiring to commit, or aiding and abetting the commission of maintaining a house of prostitution and (2) committing or aiding and abetting the commission of accepting the earnings of a prostitute. Hence, although the statute specifically permits the prosecution to establish a pattern of racketeering activity through the commission of the predicate offenses as well as through other means such as conspiracy to commit, and aiding and abetting the commission of, the predicate offenses, in the present case the prosecutor elected not to pursue a conspiracy theory with regard to the predicate offense of accepting the earnings of a prostitute. Understood in this context, the trial court's use of "and/or" in the instruction is a reference to the fact that the predicate offenses may be proved by some or all of the means listed, depending on the specific nature of the charge.

Immediately after this instruction, the trial court instructed the jury on conspiracy and stated that it applied only to the predicate offense of maintaining a house of prostitution. After the instructions on conspiracy, the trial court explained that the aiding and abetting theory applied to both predicate offenses. The court then instructed the jury on the elements of the predicate offense of maintaining a house of prostitution. It then stated, the "second predicate . . . that you must find in determining whether there was racketeering is that . . . defendants committed or aided and abetted in the commission for financial gain; that is, knowingly accepting . . . the earnings of a prostitute." The court then instructed the jury on the elements of that offense. Finally, the trial court instructed the jury that it must find defendant guilty of both predicate offenses in order to convict him of racketeering.

Because the trial court's use of "and/or" is a reference to the manner of proving the predicate offenses rather than an instruction that the pattern of racketeering activity element of racketeering may be established by proof of one predicate offense, there was no plain error. Further, even if we were to conclude that the use of "and/or" under the circumstances was confusing, we would hold that the instructions as a whole were fair and accurate. *Dumas, supra* at 396. Therefore, there was no error warranting reversal.

Defendant also contends that the trial court improperly instructed the jury as follows:

> And your options are, in Count I, what they are charged with, racketeering. You also may consider the lesser and included offenses of either operating a house of ill fame or accepting the earnings of a prostitute. So you can decide on the offense charged, racketeering, where they must prove both of those; accepting the earnings of a prostitute and maintaining a house of ill fame, or you may consider as a

lesser included offense whether they have fulfilled either
one of those obligations, those elements.

Defendant argues that this instruction improperly told
the jury that it could find defendant guilty of racketeer-
ing without committing the predicate offenses for finan-
cial gain or establishing a common scheme. This con-
tention is without merit. The trial court gave this
instruction with regard to the jury's order of delibera-
tions and immediately preceding its explanation of the
verdict form. Taken in context, this instruction in-
formed the jury that it could consider either the rack-
eteering offense or the lesser included offenses. It did
not instruct the jury that it could disregard the ele-
ments of any of those offenses. Hence, there was no
plain error.

Finally, defendant also argues that the trial court
failed to instruct the jury on conspiracy to commit
racketeering and aiding and abetting the commission of
racketeering. Defendant's arguments are without
merit. Defendant was not charged with conspiring to
commit, or aiding and abetting the commission of,
racketeering. Hence, the trial court did not need to give
an instruction on conspiracy to commit racketeering or
aiding and abetting the commission of racketeering.
Those instructions were properly applicable only to the
predicate offenses for which they were read. There was
no plain error warranting reversal.

### XV. CONCLUSION

In Docket Nos. 256461, 256463, and 256464, the trial
court erred when it instructed the jury that it could find
defendants Bobby Martin, Thompson, and Brown guilty
of the uncharged offense of keeping a house of prosti-
tution as a necessarily included lesser offense of rack-
eteering. Therefore, we reverse these defendants' con-

victions and vacate their sentences for keeping a house of prostitution in violation of MCL 750.452. In Docket Nos. 261025 and 261088, we find no errors warranting reversal. Therefore, we affirm the convictions and sentences of defendants Billy Martin and Frasure.