*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DANE RICHARD KRUKOWSKI,

        Defendant-Appellant.

UNPUBLISHED
August 1, 2019

No. 334320
Saginaw Circuit Court
LC No. 15-041274-FH

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CODIE LYNN STEVENS,

        Defendant-Appellant.

No. 337120
Saginaw Circuit Court
LC No. 15-041275-FH

Before: TUKEL, P.J., and SERVITTO and RIORDAN, JJ.

PER CURIAM.

In these consolidated appeals, defendants appeal as of right their jury trial convictions of second-degree child abuse, MCL 750.136b(3).[1] The trial court sentenced defendant Dane Krukowski to 36 months to 10 years' imprisonment and sentenced defendant Codie Stevens to 18 months to 10 years' imprisonment as well. We reverse, vacate defendants' convictions and sentences, remand, and direct the trial court to enter judgements of acquittal in both cases.

---

[1] Defendants had a joint jury trial before separate juries.

## I. BACKGROUND

Defendants are the biological parents of RK. RK was born after a 19-hour labor and, according to Stevens, was bruised from forehead to mid-chest from the cesarean section delivery. A few days after his birth, Stevens took RK to see pediatrician Elvira M. Dawis. According to Stevens, the baby was having trouble keeping formula down and was not easily comforted. Dr. Dawis testified that, despite being slightly jaundiced, RK was a "well-child" with a "normal-sized" head. Over time, RK became less fussy.

On Saturday, February 7, 2015, Krukowski was bathing approximately two-month-old RK in the bathtub. At some point, RK "jerked" and fell from Krukowski's soapy hands. RK hit his head on the side of the bathtub and fell facedown into the water. Krukowski immediately "scooped" him out of the water and called out to Stevens. The couple dried and dressed the baby and checked him for injuries. According to Krukowski, RK's head was "a little red" and "in due time, bruising started and swelling" and a "dime-sized bruise" eventually appeared. Stevens said that she observed "slight swelling" and a "tiny little dot" that was yellow in color on RK's head. Defendants placed a cool cloth on the baby's head and then later a frozen bag of peas. According to Stevens, after the fall RK was a little fussy and would not take a bottle, but his breathing was normal and he ate later that day. Stevens contacted her mother, who advised that defendants take the baby to the hospital "just to be safe." The grandmother visited the home later that day and observed a "dime-sized" bump on the baby's head that was not "really raised up high" with "slight shadowing." Stevens and Krukowski said that the infant was awake, smiling, and acting normal by the next day.

It is undisputed that defendants did not seek medical attention after the bathtub incident on either February 7 or February 8, 2015. On Monday, February 9, 2015, Stevens, accompanied by her mother, took RK to see Dr. Dawis for a previously scheduled appointment. The "bump" on RK's head was gone. Stevens said that she told the doctor that RK was still somewhat colicky and that he would not sleep on his back, but that a new formula was working. According to Dr. Dawis, Stevens reported that RK was fussy, irritable, and could not be pacified. Stevens testified and her mother confirmed that Stevens told the doctor about RK's "incident in the tub" explaining that the baby "had fallen out of [Krukowski's] arms and had hit his head." However, Dr. Dawis denied that Stevens told her about the accident and the doctor's notes from the visit stated that "mom denies any fall."

Because RK was fussy and irritable, Dr. Dawis recommended that he see a chiropractor. Later that day, chiropractor Michael J. Dense performed chiropractic adjustments on the baby. He explained that to treat an infant he suspends the baby by their feet and "give[s] a little pump," which makes "the baby arch its back" and causes the spine to align. He said it would make a sound like "a little click." Dr. Dense said that the baby "seemed to be relieved after the first adjustment" and that he was not crying. The maternal grandmother testified that she was "shocked" at the adjustment and heard RK's back "crack" at least twice; Stevens said she was "skeptical" and also heard RK's back "crack." RK attended a second and third chiropractic appointment with another chiropractor in the practice, Dr. Jason Barrigar, on February 10, 2015 and February 18, 2015. Dr. Barrigar observed RK to be "very happy" and "looking around the room." He said that he was not informed that RK had hit his head and he said that he did not personally observe any bumps or bruises on the baby.

On February 21, 2016, RK vomited after Stevens fed him. When she attempted to feed him three or four hours later, he vomited again. She laid him in his crib and when she checked on him later he was "covered in vomit." She testified that she was concerned, but thought he might have the flu. She made him a bottle of peppermint water, which he was able to keep down. At 10:30 p.m., she made him a smaller bottle of peppermint water. She said he kept it down and slept through the night, but the next morning she awoke to him "whimpering." RK was "lying on his side, [and] his arm was twitching." She told Krukowski that it looked like the baby was having a seizure. According to defendants, they immediately took RK to the emergency room.

Emergency room nurse Sara Markle testified that RK was alert, his vital signs were stable, and he did not have any outward signs of trauma. She did not recall defendants disclosing that RK had suffered a fall weeks earlier. Dr. Jessica Kirby, the emergency room physician, also said that RK had no obvious signs of trauma, but was exhibiting shaking activity. Her initial thought was that low-sodium levels or an electrolyte abnormality could be causing the seizures. According to Stevens, RK was administered Ativan intravenously to stop the seizures. Krukowski testified that RK's hand or arm was "cranked" back in an "abnormal position" in order to insert the needle.

The baby's laboratory results were normal, so Dr. Kirby ordered a CAT scan, which revealed that the baby's brain was bleeding. Dr. Kirby was concerned that the brain bleeds were caused by "non-accidental trauma" and suspected abuse right away. After defendants were informed of the CAT scan results, they relayed to Dr. Kirby that RK had fallen in the bathtub approximately two weeks earlier. RK was transferred to the pediatric intensive care unit (PICU) where his condition "deteriorated" to the point that he needed a ventilator and a feeding tube and had to have a catheter inserted into his fontanelle to relieve pressure and remove fluid from his skull. Pediatrician Michael Fiore testified that RK had bleeding in the brain, multiple rib fractures, ongoing seizure activity, and retinal hemorrhages, all of which were assessed as being the result of "non-accidental trauma." According to Dr. Fiore, the baby would have died if he had not received medical treatment when he did.

Ophthalmologist Majed Sahouri performed diagnostic testing and took "RetCam" photographs of the back of the baby's eye. He said that RK had multiple retinal hemorrhages that were "too numerous to count" and severe enough to be characterized as nonaccidental. He said that shaking could cause the hemorrhages, but in his opinion, blunt-force trauma could not. He testified that the hemorrhages were "very consistent . . . with non-accidental trauma, and shaking" and that he doubted that chiropractic treatment could cause the hemorrhages. He indicated that some of the hemorrhages appeared darker, which could indicate different ages; however, he could not specify with medical certainty the ages of the hemorrhages.

Radiologist Gerard Farrar testified about MRI images of RK's brain taken on February 22, 2015, which showed "subdural hygroma" or abnormal "fluid around the brain," as well as more recent "acute blood." He said these were from at least two separate injuries. He said there was "a possibility" that either the subdural hygroma or the acute blood could have been caused by the bathtub fall. The prosecutor asked him if he had heard of shaken baby syndrome (SBS) and whether that could have caused the injuries. Dr. Farrar said that SBS could have caused the

-3-

injuries. He also said it was possible that the older fluid was caused by a rough delivery, but that the newer fluid was "unlikely" to be from delivery.

Neurological surgeon Frank Paul Schinco testified that the hemorrhages in RK's brain were 36 to 48 hours old. He estimated that the older bleed was at least more than a week old. He said that the blood clots in RK's brain, in conjunction with the retinal hemorrhages, "would indicate a very significant probability and likelihood that the child had been shaken in a typical manner . . . that is highly diagnostic of that shaken baby syndrome."

Radiologist Kristin Constantino interpreted a skeletal survey x-ray of the baby's entire body taken on March 1, 2015. RK had a new fracture on the left side of his skull, an old one on his left forearm, and old ones on multiple ribs. She opined that the skull fracture could "potentially" have been from the bathtub fall.

RK ultimately spent nine days in the PICU. Shortly after he was released, defendants were charged with second-degree child abuse, MCL 750.136b(3). At trial, the prosecution called the child's treating doctors as witnesses, including Dr. Sahouri (ophthalmology), Dr. Dawis (pediatric medicine), Dr. Kirby (emergency medicine), Dr. Dense (chiropractic medicine), Dr. Barrigar (chiropractic medicine), Dr. Farrar (neuroradiology), Dr. Constantino (radiology), Dr. Schinco (neurosurgery), and Dr. Fiore (pediatric critical care). They also called the maternal grandmother. Defendants both testified on their own behalf and police interviews recorded at the hospital were played for the jury. The defense did not call any expert witnesses. At the conclusion of the six-day trial, both defendants were found guilty of second-degree child abuse.

Defendants appealed as of right. On appeal, they both moved this Court to remand for a *Ginther*[2] hearing, claiming that their attorneys were ineffective for failing to obtain an expert to dispute the prosecution's evidence that RK had been shaken. Alternatively, they argued that their attorneys were ineffective for failing to object to the shaking evidence as irrelevant and unfairly prejudicial. We consolidated[3] the appeals and remanded to the trial court for an evidentiary hearing.[4] These matters now return to this Court.

---

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[3] *People v Krukowski*, unpublished order of the Court of Appeals, entered May 4, 2017 (Docket Nos. 334320; 337120).

[4] *People v Krukowski*, unpublished order of the Court of Appeals, entered May 19, 2017 (Docket No. 334320); *People v Stevens*, unpublished order of the Court of Appeals, entered May 19, 2017 (Docket No. 337120).

## II. SUFFICIENCY OF THE EVIDENCE

In supplemental briefs, defendants contend that there was insufficient evidence to support their convictions because the alleged omission of failing to seek medical attention for RK is not proscribed in the second degree child abuse statute, MCL 750.136b(3). We agree.[5]

We review a challenge to the sufficiency of the evidence de novo. *People v Martin*, 271 Mich App 280, 340; 721 NW2d 815 (2006). When reviewing such a claim, this Court reviews the record in a light most favorable to the prosecution to determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. *Id.* This Court also reviews issues of statutory interpretation de novo. *People v Williams*, 475 Mich 245, 250; 716 NW2d 208 (2006).

The statute under which defendants were convicted, MCL 750.136b, states, in relevant part:

> (3) A person is guilty of child abuse in the second degree if any of the following apply:
>
> (a) The person's omission causes serious physical harm or serious mental harm to a child or if the person's reckless act causes serious physical harm or serious mental harm to a child.
>
> (b) The person knowingly or intentionally commits an act likely to cause serious physical or mental harm to a child regardless of whether harm results.

In addition, MCL 750.136b(1)(c) defines "omission" as "a willful failure to provide food, clothing, or shelter necessary for a child's welfare or willful abandonment of a child."

As previously stated, the prosecutor set forth three theories of second-degree child abuse: an "abandonment" theory, a "reckless act" theory, and an "intentional act" theory. During final jury instructions, the trial court also stated that the jurors had three theories to consider in support of second-degree child abuse. It said that the first theory was an "abandonment" theory, and that to convict under this theory, one needed to find that defendants "wilfully abandoned" RK and thereby caused him serious physical harm. It defined "abandon" as "to withdraw one's support or one's help, especially to do so despite a duty, allegiance, or responsibility." The trial court identified the second theory as a "reckless act" theory, and stated that to convict under this theory, one needed to find that the child was seriously harmed because defendants "did some reckless act, consisting of treating [the child] . . . with inadequate home remedy for an obvious head injury, rather than seeking professional medical treatment." The trial court stated that, to convict under the third theory, one needed to find that defendants "knowingly or intentionally

---

[5] Defendant have raised additional arguments on appeal, but due to our complete resolution of these matters on the arguments based on sufficiency of the evidence, we need not address the additional arguments.

did an act likely to cause serious physical harm to" RK, and that the "intentional act alleged consists of treating [the child] . . . with inadequate home remedy for an obvious head injury, rather than seeking professional medical treatment." Defendants contend that the prosecutor's theories in this case were all theories of *omission*, and that such theories under the facts of the present case do not comport with the wording of MCL 750.136b because of the way that statute defines the term "omission."

*People v Murphy*, 321 Mich App 355, 357-359, 910 NW2d 374 (2017), provides this Court with guidance on this issue. In that case, the defendant was convicted of second-degree child abuse under MCL 750.136b(3)(a) based on the death of her child, which occurred after the child ingested a toxic amount of morphine. The child's grandmother had been living in the home of the defendant and the child, and the grandmother, who died before the child did, had been prescribed morphine. *Id*. at 358. The prosecutor "argued that a [morphine] pill had likely fallen to the floor and that because [the child's] parents had failed to clean the bedroom, [the child] found the pill and consumed it." *Id*. at 358 n 2. The prosecutor contended that the defendant committed a reckless act because the home was in a deplorable condition and the defendant "failed to clean the home to ensure that the morphine pills were removed . . . ." *Id*. at 358.

This Court noted that the "omission" portion of MCL 750.136b(3)(a) was inapplicable because there was "no evidence that [the defendant] willfully failed to provide food, clothing, or shelter to [the child] or that she willfully abandoned her." *Id*. at 360 n 4. This Court stated that "the only theory on which the jury was instructed" was the theory of "a reckless act causing serious physical harm . . . ." *Id*. at 360. The Court concluded that "[s]imply failing to take an action does not constitute an act" and that "the prosecutor presented no evidence that any affirmative act taken by [the defendant] led to [the child's] death." *Id*. at 361. The Court stated that the prosecutor "only directed the jury to [the defendant's] reckless *inaction*, i.e., her failure to clean her house to ensure that morphine pills were not in [the child's] reach." *Id*. Accordingly, the Court vacated the defendant's conviction of second-degree child abuse. *Id*.

The statutory language encompasses an "act" which is, according to *Murphy*, *id*., "[s]omething done or performed." (Quotation marks and citation omitted.). As implied by the *Murphy* Court, the "act" alleged must be the causative factor in causing serious harm, MCL 750.136b(3)(a), or in being likely to cause serious harm, MCL 750.136b(3)(b). Here, the prosecutor identified the use of home remedies, specifically using cold peas as a compress and giving the child peppermint water, as the affirmative "acts" at issue. The problem, however, is that there was no allegation that the use of these home remedies is what harmed the child or was likely to harm the child. Indeed, as a matter of pure common sense, applying a cold compress to a child's head or giving a child peppermint water is not likely to lead to seizures and severe swelling of the brain or otherwise lead to harm. It is overwhelmingly clear that the causative factor as alleged by the prosecutor was *the failure to seek professional medical treatment*.[6]

---

[6] This is reinforced by the prosecutor's various arguments at trial. In addition, the felony information in each case lists the relevant misdeed as "failing to seek medical treatment after significant trauma which resulted in further or exacerbated physical injuries or deterioration of the child's health and/or intentionally causing physical trauma." And, at the preliminary

Indeed, the trial court explicitly incorporated this failure to seek professional medical treatment into its instructions for the prosecutor's second and third theories. The *Murphy* Court has clearly stated that *inaction* cannot be equated with an "act" for purposes of the child-abuse statute. *Murphy*, 321 Mich App at 361. Accordingly, the "reckless act" and "intentional act" theories set forth by the prosecutor were not encompassed by the language of MCL 750.136b.

Although defendants do not specifically mention the prosecutor's "abandonment" theory in their supplemental briefs, an argument about this theory is encompassed by way of their argument that "a failure to provide medical treatment is not covered under the definition of omission in MCL 750.136b(1)(c)." Indeed, the prosecutor's allegation regarding the "abandonment" theory was that defendants abandoned the child by failing to provide him with adequate medical care. MCL 750.136b(1)(c) defines "omission" as "a willful failure to provide food, clothing, or shelter necessary for a child's welfare or willful abandonment of a child." MCL 750.136b does not define "abandonment." However, unambiguous statutory language must be enforced as written. *Williams*, 475 Mich at 250. In addition, terms not expressly defined in a statute are to be interpreted in accordance with their ordinary meaning and the context in which they are used. *People v Lewis*, 302 Mich App 338, 342; 839 NW2d 37 (2013). It is a stretch to equate the failure to seek medical care with the plain and ordinary meaning of the term "abandonment." And, "when a term is not defined in a statute, the dictionary definition of the term may be consulted or examined." *Id*. *Merriam-Webster's Collegiate Dictionary* (11th ed.) defines "abandon," in part, as "to give up with the intent of never again claiming a right or interest in; to withdraw protection, support, or help from." The failure to seek a certain type of medical care is not equivalent to withdrawing protection, help, or support from a child, or giving a child up with the intent never to claim an interest in the child.

Moreover, under the doctrine of *expressio unius est exclusion alterius*, the "express mention of one thing implies the exclusion of another." *Coalition Protecting Auto No-Fault v Mich Catastrophic Claims Ass'n (On Remand)*, 317 Mich App 1, 15 n 6; 894 NW2d 758 (2016) (quotation marks and citations omitted). The Legislature has defined omission to encompass the willful failure to provide "food, clothing, or shelter" but does not mention the willful failure to provide medical care. MCL 750.136b(1)(c). Finally, statutes should be interpreted in order to give effect to every term. *People v Peltola*, 489 Mich 174, 181; 803 NW2d 140 (2011). Under the prosecutor's overarching theory, "abandonment" of a child would encompass not only the failure to provide medical care, but also the failure to provide, for example, food, because both these failures would represent the shirking of parental duties. Yet, this would render the delineation of "a willful failure to provide food" in MCL 750.136b(1)(c) surplusage, which is to be avoided. *Id*.

Clear statutory language is to be enforced as written, *Williams*, 475 Mich at 250, and *Murphy* is binding under MCR 7.215(J)(1). Under the factual circumstances in this case, and based on the theories presented, the prosecutor failed to present sufficient evidence under which

---

examination, the prosecutor argued for a bindover based on an "omission" theory, and the court authorized the bindover without much explanation regarding its reasoning.

to convict defendants of second-degree child abuse. Accordingly, defendants cannot be retried for second-degree child abuse, MCL 750.136b(3) as dictated by double jeopardy principles. *People v Mitchell*, 301 Mich App 282, 294; 835 NW2d 615 (2013). See also, *Burks v United States*, 437 US 1; 98 S Ct 2141; 57 L Ed 2d 1 (1978) (when an appellate court finds that the evidence is insufficient to sustain guilt, that court determines that the prosecution has failed to prove guilt beyond a reasonable doubt and to permit a second trial would negate the purpose of the Double Jeopardy Clause); *Lockhart v Nelson*, 488 US 33; 33-34; 109 S Ct 285; 102 L Ed 2d 265 (1988) (A reversal for evidentiary insufficiency "is the functional equivalent of a trial court's granting a judgment of acquittal at the close of all the evidence.").

Reversed. We vacate defendants' convictions and sentences, remand, and direct the trial court to enter judgements of acquittal in both cases. We do not retain jurisdiction.


/s/ Jonathan Tukel
/s/ Deborah A. Servitto
/s/ Michael J. Riordan